# EXHIBIT 1



### Service Framework Agreement

This Service Framework Agreement (the **"Agreement"**) is entered into on 21 June, 2021 by and between:

1. Bitmain Technologies Georgia Limited (the **"Party A"**), a company duly established and validly existing under the laws of the State of Georgia of the United States with its registration number21203283; and

2. ISW Holdings, Inc. (the **"Party B"**), a company duly established and validly existing under the laws of the United States of America with its registration number 47-2339650.

Each of the Party A and Party B shall be hereinafter referred to as a **"Party"** respectively, and as the **"Parties"** collectively.

Based on the principle of mutual benefit and equal cooperation, the Parties, after friendly negotiation, in accordance with the applicable laws and regulations, have reached this Agreement regarding (i) the server hosting, operation and/or maintenance services provided by Party B to Party A, (ii) the payment of service fees by Party A to Party B, and (iii) other related matters.

### 1. Definitions

The following definitions in this Article 1 apply in this Agreement and its annexes unless indicated otherwise.

1. **"Hosted Server(s)"**: means the server(s) that Party A entrusts Party B to provide Services, the model and quantity of which shall be agreed on by the Parties in the Service Order.

2. **"Service(s)"**: means the service(s) that Party A entrusts Party B to provide in order to ensure the normal operation of the Hosted Server, including but not limited to the Hosting Services, Operation Services and Maintenance Services, types of which applicable to specific projects shall be agreed on by the Parties in the Service Order.

3. **"Hosting Services"**: means the facilities, resources and services provided by Party B such as data center computer rooms, computer positions, power facilities, security monitoring, management personnel, etc., for storing and operating Hosted Servers.

1

4. **"Operation Services"**: means the resources and services provided by Party B such as management personnel, management software, management services, etc., to carry out physical server monitoring, server working status monitoring, server working status report, and server on-rack and off-rack, and maintenance (excluding batch on-rack when entering and batch off-rack when exiting), in order to ensure the normal operation of the Hosted Servers.

5. **"Maintenance Services"**: means the maintenance services provided by Party B for the Hosted Servers.

6. **"Service Fees"**: means the full cost for Services provided by Party B which shall be paid by Party A to Party B. Unless otherwise agreed in this Agreement or the Service Order, Party A shall not pay Party B any other fees other than the Service Fees. According to the content of Services provided by Party B, Service Fees may include Hosting Fees, Operation Fees, and Maintenance Fees.

7. **"Power Consumption"**: means the amount of power consumed by the Hosted Servers during the service period, which shall be determined according to the sum of the reading number of the electric metering devices separately set up for Servers by Party B and the actual line loss. The setting position of the electric metering devices shall be the inlet end of the transformer high voltage side and the unit is kWh.

8. **"Hosing Fees"**: means the cost for the Hosting Services provided by Party B which shall be paid by Party A to Party B, which shall include the electricity fees collected by Party B from Party A and the service fees for Party B's Hosting Services.

9. **"Hosting Unit Price"**: means the Hosting Fees that Party A shall pay to Party B for every kWh of electricity consumed by the servers when Party B provides the Hosting Services, which is the Normal Hosting Unit Price agreed on by the Parties in the Service Order in normal circumstances, but is automatically adjusted pursuant to the provisions of the Article 4.3 of this Agreement in the event of a situation stipulated in Article 4.3 of this Agreement.

10. **"Normal Hosting Unit Price"**: means the Hosting Unit Price applicable in the normal circumstances, which shall be agreed on by the Parties in the Service Order.

11. **"Lowest Hosting Unit Price"**: means the price floor of the Unit Hosting Price when the Parties adjust the Unit Hosting Price pursuant to the Article 4.3 of this Agreement, which shall be agreed on by the Parties in the Service Order.

12. **"Operation Fees"**: means the cost for the Operation Services provided by Party B which shall be paid by Party A to Party B.

13. **"Operation Unit Price"**: means the Operation Fees that Party A shall pay to

2

Party B for every kWh of electricity consumed by the servers when Party B provides the Operation Services, which shall be agreed on by the Parties in the Service Order.

14. **"Maintenance Fees"**: means the cost for the Maintenance Services provided by Party B which shall be paid by Party A to Party B, which shall be agreed on by the Parties in the Service Order.

15. **"Bill"**: means the bill checked regularly by the Parties for information such as current Power Consumption, current Services Fees and current service interruptions (if any).

16. **"Theoretical Computing Power"**: means the computing power data listed on the factory logo of the Hosted Servers.

17. **"Actual Computing Power"**: means the actual computing power data displayed by server monitoring software in the actual operation of the Hosted Servers. In addition, the statistical system of mining pools may also be used as comparison for Actual Computing Power. The parties shall agree on the specific monitoring software and its version for counting the Actual Computing Power in the Service Order.

18. **"Unqualified Hosted Server(s)"**: means the Hosted Server whose Actual Computing Power is less than 80% of the Theoretical Computing Power in 8 consecutive hours.

19. **"Theoretical Computing Power PPS Income"**: means the theoretical income of the server calculated according to Theoretical Computing Power of the Hosted Server and current network difficulty. For avoidance of doubt, PPS income in this Agreement is based on PPS income calculated by BTC.com Mining Calculator from 10:00 a.m. of the previous day to 10:00 a.m. of the day (Beijing Time).

20. **"Hosting Fees Ratio"**: means the ratio of the hosting fees to the Theoretical Computing Power PPS Income.

21. **"Theoretical Hosting Fees"**: means theoretical power consumption multiplied by the Hosting Unit Price.

22. **"Theoretical Net Income"**: means Theoretical Computing Power PPS Income * Digital Assets Price (calculation period average) − (Hosting Fees + Operation Fees). The calculation period average = (the highest value of the digital assets price in the calculation period + the lowest value of the digital assets price in the calculation period)/2.

23. **"Digital Assets Price"**: means the RMB price calculated by exchanging the digital assets price to US Dollar and then to RMB, of which, (i) the exchange rate of digital assets against US Dollar is subject to the first corresponding

3

exchange rate published on Coinmarketcap website (https://coinmar-ketcap.com/) after 10:00 a.m. (Beijing Time) the next day and (ii) the ex-change rate of US Dollar against RMB is subject to the first buying rate of a hundred US Dollars against RMB announced by Bank of China after 10:00 a.m. (Beijing Time) the next day (pursuant to the result published at http://srh.bankofchina.com/search/whpj/search.jsp), and in case of a non-working day, the exchange rate of the previous working day shall be used.

24. **"Delayed Time"**: means the length of time that the normal operating environ-ment of the data center according to the Service Order should be reached but is not actually reached.

25. **"Environmental Failure Period"**: means the period that Hosted Server can-not work properly not due to its own failure, the reasons for which include, but not limited to, the following:

    (1) Unavailability of electricity, including the failure of the Hosted Server to work properly resulted from the interruption of power supply, damage of power equipment and maintenance of power equipment;
    (2) Unavailability of network, including the failure of the Hosted Server to work properly resulted from the network connection interruption, network equipment damage and network equipment maintenance;
    (3) Unavailability of data center, including the failure of the Hosted Server to work properly resulted from the damage and maintenance of the infrastruc-ture such as factory buildings and racks in the data center.

26. **"Average Environmental Failure Period"**: means the sum of the Environ-mental Failure Period of all the Hosted Servers divided by the amount of the Hosted Servers.

27. **"Data Center Information Memorandum"**: means the memorandum sub-mitted by Party B to Party A for the record, which includes basic information such as power, network and compliance of the data center, the form of which attached hereto as Annex 1.

28. **"Service Order(s)"**: means the service orders signed separately by the Parties on specific cooperation projects and business terms, the form of which at-tached hereto as Annex 2.

2. **Service Content**

The services provided by Party B to Party A includes Hosting Services, Operation Services and Maintenance Services, types of which applicable to specific projects shall be agreed on by the Parties in the Service Order.

3. **Rights and Obligations of Party A**

    1. Party A shall have the right to choose the type of the Hosted Server including but not limited to specifications, models and version at its own discretion.

4

2. Party A shall have the right to send personnel to the data center to monitor the operation of Hosted Servers in real time and deploy the monitoring system designated by Party A in the data center to remotely monitor the operation of the Hosted Servers in real time.

3. Party A shall have the right to carry out environmental inspection and safety audit of the data center at any time, and Party B shall cooperate with Party A.

4. Party A shall have the right to conduct physical inventory check of the Hosted Servers at any time, and Party B shall cooperate with Party A.

5. Party A shall pay the Service Fees to Party B pursuant to the Service Orders. If Party A's payment delay exceeds five (5) business days which is not resolved within five (5) business days after receiving written notice from Party B, Party B may shut down the Hosted Servers; and if Party A's payment delay exceeds fifteen (15) business days, Party B shall be entitled to remove the Hosted Servers off the rack.

## 4. Hosting Services

If Party B provides Hosting Services, Article 4 of this Agreement is applicable.

### 1. The hosting obligations of Party B

1. Party B shall provide the separate data center computer rooms to store and operate the Hosted Servers. Without written notice from Party A, no servers or equipment other than Party A's may be deployed inside the relevant computer rooms. If a single computer room may not be filled up with servers of Party A, Party B may deploy other servers in such computer room after taking isolation measures and obtaining written consent from Party A, which shall not be unreasonably withheld.

2. Party B shall ensure that the data center reaches the normal operating environment, and provides the computer positions, power load and facilities, broadband network and network facilities, security monitoring and other equipment required for the normal operation of the Hosted Servers prior to the arrival of the Hosted Servers (the specific time shall be separately agreed in the Service Order).

3. Party B is responsible for the physical security of the data center and the Hosted Servers, ensuring that no safety accidents such as damage, loss, fire occur.

4. Party B shall ensure that the power supply, Internet connection and infrastructure of the data center are in compliance with the Service Order and ensure the normal operation of the Hosted Servers.

5. Party B shall guarantee that the data center is not under any ownership disputes and shall submit to Party A one copy of the business license and the

5

applicable lease for the real property on which the Services are to be performed no later than thirty (30) business days following the execution of this Agreement by the Parties.

6. Party B shall provide Party A with production facilities for Party A and the personnel designated by Party A to use, the specific content of which shall be agreed on by the Parties in the Service Order.

## 2. Hosting Fees

Hosting Fees = Power Consumption * Hosting Unit Price

Except for the circumstances stipulated in Article 4.3 of this Agreement, the Hosting Unit Price is the Normal Hosting Unit Price agreed by the Parties in the Service Order.

The payment method of the Service Fees shall be agreed on by the Parties in the Service Order.

## 3. Adjustment method of Hosting Fees

1. If the situation of Hosting Fees Ratio greater than or equal to 90% lasts for more than forty-eight (48) hours, the Hosting Fees shall be automatically adjusted to 80% of the current Theoretical Computing Power PPS Income, provided that the Hosting Unit Price is not lower than the Lowest Hosting Unit Price in the Service Order. Party A shall send the price adjustment memorandum notice to Party B within twenty-four (24) hours after the occurrence of such situation and if Party B has any doubts regarding the price adjustment, Party B shall give feedback to Party A within twenty-four (24) hours after the sending out of the price adjustment memorandum notice by Party A.

2. If the Hosting Unit Price has been adjusted to the Lowest Hosting Unit Price and when the situation of Hosting Fees Ratio greater than or equal to 90% lasts for more than seventy-two (72) hours, Party A is entitled to request the temporary shutdown of the Hosted Servers. Party A is not obliged to pay any Service Fees during the shutdown of the Hosted Servers. When the Hosted Servers are shut down, Party B is shall allow the Hosted Servers to continue to be stored in the rack for fifteen (15) days, during when, Party A is entitled to request to power on and continue to run the Hosted Servers at any time. If the Hosted Servers are shut down for more than fifteen (15) consecutive days, Party B is entitled to request Party A to remove the Hosted Servers off the rack and terminate the corresponding Service Order.

3. After the Hosting Fees are reduced in accordance with Article 4.3.1 of this Agreement, and if the situation of Hosting Fees Ratio less than or equal to 60% lasts for more than forty-eight (48) hours, the Hosting Fees shall be automatically adjusted to 80% of the current Theoretical Computing Power PPS Income, *provided* that the Hosting Unit Price is not greater than the Normal Hosting Fees in the Service Order. Party B shall send the price adjustment

6

memorandum notice to Party B within twenty-four (24) hours after the occurrence of such situation and if Party A has any doubts regarding the price adjustment, Party A shall give feedback to Party B within twenty-four (24) hours after the sending out of the price adjustment memorandum notice by Party B.

**4. Hosting abnormal and defaults**

1. If the data center fails to reach the normal operation environment according to the time agreed in the Service Order, Party B shall waive Party A's Hosting Fees twice as long as the Delayed Time (for example: if the Delayed Time is twenty-four (24) hours, which means that twenty-four (24) hours have passed before the data center reaches the normal operating environment, then Party B shall waive forty-eight (48) - hour Hosting Fees from Party A). And if the Delayed Time is more than one hundred and twenty (120) hours, then Party A is entitled to unilaterally terminate the Service Order.

2. If the environment of the data center (including but not limited to temperature, humidity, air pressure, etc.) cannot satisfy the requirements of the Service Order and fails to satisfy the such requirements ten (10) days after receiving written notice from Party A, Party A is entitled to unilaterally terminate the Service Order.

3. In case of the occurrence of the following unforeseen, unavoidable or insurmountable events:

   - Unexpected executive order by the government and inspection by the electricity company,
   - Electricity accidents at the city level and network accidents at the city level,
   - Natural disasters such as floods, volcano eruption, earthquakes, etc.,
   - Abnormal social events such as wars and turmoil,

   which leads to the shutdown or abnormal of the Hosted Servers, Party B shall reduce the current Hosting Unit Price as the compensation for Party A's losses and the reduced current Hosting Fees shall be the higher of the following:

      (1) the difference between the original current Hosting Fees and the theoretical net income lost by Party A during this period;
      (2) the current Hosting Fees calculated based on the Lowest Hosting Unit Price.

   Meanwhile, Party A is entitled to unilaterally terminate the Service Order in advance.

4. In the absence of the circumstances stipulated in <u>Article 4.3.3</u> of this Agreement and if the Average Environmental Failure Period of the Hosted Servers in one single account month exceeds fifteen (15) hours, Party B is obliged to compensate Party A for the theoretical net income loss of the Hosted Servers of Party A during this period, and the theoretical not income shall be included

7

in the current Bill after verification by the Parties. If the accumulation of the Average Environmental Failure Period of the Hosted Servers when the Service Order is valid exceeds two hundred and forty (240) hours, in addition to the compensation of the corresponding theoretical net income by Party B to Party A, Party A is entitled to terminate the Service Order in advance.

5. In case of the loss of the Hosted Servers, Party B shall compensate Party A according to the market value of the Hosted Servers at the time of the loss, unless such server loss accident is caused by Party A.

6. Party A is entitled to terminate the Service Order in advance if any of the following occurs:

   (1) the Hosted Servers to be completely shut down due to power outages, network outages and other reasons three (3) times or more in one single account month;

   (2) the occurrence of the following situation reaches two (2) times in one single account month: in the event of the shutdown of the Hosted Servers due to foreseeable planned power outage or network disconnection, Party B fails to notify Party A in writing within twenty-four (24) hours after knowing the plan and at the same time fails to ensure that the information is delivered ty Party A contact by other measures;

   (3) the occurrence of the following situation reaches two (2) times in one single account month: in the event of the shutdown of the Hosted Servers due to unforeseeable and unplanned power outages or network disconnection, Party B fails to notify Party A in writing within forty-eight (48) hours after the occurrence of such situation and at the same time fails to ensure that the information is delivered ty Party A contact by other measures;

   (4) the occurrence of the loss of Hosted Servers when the Service Order is valid.

7. Except for the termination of the Service Order pursuant to Article 7.2 of this Agreement, if one Party unilaterally terminates the Service Order in full or in part in advance, this Party shall compensate the other Party ten (10)-day theoretical Hosting Fees of all or part of the Hosted Servers under the Service Order the services for which is terminated in advance.

5. **Operation Services**

If Party B provides Operation Services, Article 5 of this Agreement is applicable.

1. **The operation obligations of Party B**

1. Party B is responsible for the physical server monitoring, server working status monitoring, server working status report, and server on-rack and off-rack and maintenance in relation to the Hosted Servers, excluding batch on-rack when entering and batch off-rack when exiting.

8

2. Party B shall configure the Hosted Servers strictly in accordance with Party A's prior written authorization, including connection to the mining pools, setup of the miner's number and update of the version of the firmware. Party B shall not configure the Hosted Servers without prior written authorization from Party A.

3. Party B shall keep monitoring the status of Hosted Servers with the monitoring software in real time, and compile *Daily Report on Server Status* (the form of which attached hereto as Annex 3) and submit it to Party A according.

4. Party B shall send the Unqualified Hosted Servers to the maintenance spot designated by Party A within three (3) to five (5) Business Days after the off-rack of the Unqualified Hosted Servers and the shipping fees shall be borne by Party A.

**2. Operation Fees**

The payment method of the Operation Unit Price and Operation Fees shall be agreed on by the Parties in the Service Order.

Operation Fees = Power Consumption * Operation Unit Price, or
Operation Fees = Amount of the Hosted Servers * Operation Unit Price

**3. Liability for Breach**

1. If Party B fails to provide standard Operation Services in accordance with the requirements set forth in the Service Order, Party B shall compensate in accordance with the agreed standards set forth in the Service Order.

2. If Server is damaged or lost due to Party B's negligence, Party B shall compensate Party A according to the market value of Hosted Servers at the time of the accident/incident.

3. If Party B fails to send to Party A the *Daily Report on Server Status* on time in accordance with this Agreement, Party A is entitled to require Party B to pay the liquidated damages in accordance with the standard of $50 for each breach, and Party A is entitled to deduct the above-mentioned liquidated damages from the Service Fees payable to Party B.

4. If Party B fails to send the Unqualified Hosted Servers to the maintenance spot designated by Party A in accordance with the agreed period stipulated in Article 5.1.4 of this Agreement, Party B shall compensate Party A the theoretical net income during the timeout period.

6. **Maintenance Services**

If Party B provides Maintenance Services, Article 6 of this Agreement is applicable.

9

1. **The Maintenance Obligations of Party B**

   Party B shall demonstrate the server maintenance capability of the data center in the Data Center Information Memorandum. If Party B finds out that there exists any problem or hidden danger in the operation of the Hosted Servers, Party B shall inform Party A immediately, and if it is confirmed by Party A in writing that the server is faulty, Party B shall repair the failed Hosted Servers in accordance with the maintenance capability agreed in the Service Order.

2. **Maintenance Fees**

   Party A shall pay Maintenance Fees to Party B. The Maintenance Unit Price shall be agreed on by the Parties in the Service Order.

3. **Liability for Breach**

   If Party B fails to repair the failed Hosted Servers in accordance with the maintenance capability agreed in the in the Service Order, Party B shall compensate Party A the theoretical net income of the failed Hosted Servers during the period when the repair should have been completed.

## 7. Termination of this Agreement and the Service Order

1. This Agreement shall be terminated if any of the following circumstances occurs:

   (1) The Parties agree in writing to terminate this Agreement;
   (2) In case of either Party going through bankruptcy, reorganization, cancellation, revocation of the business license, withdrawal or merger, or dissolution, this Agreement is terminated when the counter party sends a written notice of termination of this Agreement to the other Party;
   (3) In case of either Party fails to perform the contractual obligations resulting in the substantial inability to perform this Agreement, this Agreement is terminated when the counter party sends a written notice of termination of this Agreement to the other Party;
   (4) In the event that either Party may unilaterally terminate this Agreement pursuant to this Agreement, this Agreement is terminated when the Party entitled to terminate this Agreement delivers the notice of termination to the other Party.

2. The Service Order is terminated if any of the following circumstances occurs:

   (1) When this Agreement is terminated, the Service Orders under this Agreement terminate immediately;
   (2) The Parties agree in writing to terminate the Service Order in advance;
   (3) In the event that either Party may unilaterally terminate the Service Order pursuant to this Agreement or the Service Order, the Service Order is terminated when the Party entitled to terminate the Service Order delivers the notice of termination to the other Party.



10

## 8. Confidentiality Clause

1. The content of this Agreement and any information that belongs to but not disclosed by the other Party in the course of signing or performing this Agreement through public channels are confidential information under this Agreement; without prior written consent of the Party who is entitled to disclose the confidential information, the Party who obtains the confidential information shall not give such confidential information to any third party, nor shall the Party who obtains the confidential information uses it for purposes other than those stipulated in this Agreement.

2. If either Party violates this confidentiality clause, the defaulting Party shall compensate the other Party for all losses caused thereby, and the other Party is entitled to terminate this Agreement.

3. This Article 8 shall survive termination of this Agreement until the relevant confidential information enters the public domain through legal channels.

## 9. Anti-Commercial Bribery

1. Under this Agreement, Party B and its staff shall not engage in any commercial bribery, i.e. the act of giving Party A's staff properties or other benefits in order to obtain Party A's immediate or future Service Orders or to form any other commercial cooperation relationship.

2. Property stipulated in Article 9.1 refers to cash and physical objects, including, but not limited to, money, gifts, negotiable securities (including bonds and stocks), physical objects (including all kinds of high-end household goods, luxury consumer goods, handicrafts and collections, as well as housing, vehicles and other commodities), or property paid to Party A's staff in the form of reimbursement for various fees. Other interests stipulated in Article 9.1 include, but not limited to, property interests such as tourism, entertainment preferences, debt relief, loan and guarantee, and non-property interests such as schooling, honor, special treatment, and introducing relatives and friends to work with Party B.

3. The way in which Party B provides property and other interests mentioned in Article 9.1 includes giving to Party A's staff on Party B's own initiative, and giving passively after Party A's staff members explicitly or implicitly express such needs.

4. If Party A's staff requests Party B to give any form of improper interests, Party B shall provide relevant evidence to Party A in time and cooperate with the investigation of relevant staff as Party A requires.

5. If Party B or Party B's staff commits commercial bribes directly or indirectly through third parties to Party A, Party B breaches this Agreement and shall incur a penalty of two times of the incurred amount per time. Party A shall have the right to deduct the penalty directly from the accounts payable to Party

11



B (if Party B proactively reports and provides evidence, Party B may be exempted from paying the penalty); in addition to requiring a penalty, Party A shall have the right to immediately cease all commercial cooperation with Party B, terminate this Agreement and all Service Orders being executed without liability for breach of contract, and freeze all accounts payable to Party B until both Parties settle the dispute (but Party A shall not bear the interest of such payments during this period); if Party A's actual loss exceeds the penalty stipulated in this Article 9.5, Party A shall have the right to ask Party B to indemnify Party A the difference between all the relevant losses of Party A and the penalty.

10. **Subcontractors.** Party B may hire and retain subcontractors affiliated with, or recommended in writing by, Bit5ive GA Holdings LLC ("Bit5ive") and/or Bit5ive's affiliates, parent, or subsidiaries for the performance of any or all of its obligations under this Agreement without written notice or prior consent of Party A; provided, that Party B shall remain liable for the performance of this Agreement. Any other subcontracting by either Party shall require the prior written consent of the non-assigning Party. Any assignment in violation of this Section 11 shall be deemed void *ab initio*.

11. **Assignment.** Party B may assign any of its rights and/or obligations under this Agreement to Bit5ive and/or Bit5ive's affiliates, parent, or subsidiaries without the prior consent of Party A via written notice to Party A; provided, that Bit5ive shall execute an agreement explicitly assuming liability for the performance of such obligations. Any other assignment by either Party shall require the prior written consent of the non-assigning Party. Any assignment in violation of this Section 11 shall be deemed void *ab initio*.

12. **Governing Law and Dispute Resolution**

   1. The formation, validity, interpretation, performance and dispute resolution if this Agreement shall be governed by the laws of the USA.

   2. If any provision of this Agreement is determined to be null and void or unenforceable under the applicable existing law, all other provisions of this Agreement shall remain in force. In such cases, both Parties shall reach an agreement and sign a supplementary effective agreement to replace such null and void or unenforceable agreement, and the effective agreement shall be as close as possible to the spirit and purpose of the original agreement and this Agreement.

   3. Understanding and interpretation of this Agreement shall be based on the purpose of this Agreement and the original meaning of the context and prevailing understanding and practice in the industry, and provisions of this Agreement and relevant annexes shall be understood and interpreted as a whole.

   4. Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules. The number of arbitrators shall be three. The place of arbitration shall be Nevada,

12



Georgia law shall apply. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

## 11. Miscellaneous

1. Any notice given by one party to the counter party under this Agreement shall be delivered in writing (including via e-mail, fax, etc.) to the address of the counter party listed at the beginning of this Agreement. If one party intends to change contact information, it shall notify the counter party in writing. The change of the contact information shall become effective as soon as the notification is served on the counter party.

2. Upon mutual agreement and signing of supplementary agreements, both Parties may amend, alter or terminate this Agreement in advance.

3. This Agreement shall become effective on the date when the Parties execute and seal this Contract. After this Agreement is executed, the scanned copies, copies, faxes, etc. shall have the same legal effect as the original. This Agreement is in duplicate, with each party holding one copy, with the same legal effect.

4. The annex to this Agreement is an integral part of this Agreement with the same legal effect as this Agreement.

   The remainder of this page is intentionally left blank for signature]



13

**Annex 1: Data Center Information Memorandum**

No. of the Memorandum: 1
Submitted by: ISW Holdings, Inc.
Submission Date: June 16, 2021

The information contained in this memorandum is effective until June 15th 2023.

1.  **Basic Information of the Data Center**

    Location: 154 Hyatt Street, Gaffney, SC 29341
    Land area: TBD
    Building area: 40' x 8' 1 mega watt Pods
    Construction: Steel Pods
    Computer positions can be provided:
    Heat dissipation: evaporative chilled cooling system
    Maximum temperature at the location of the data center is 90F, average temperature
    is 82F in the summer 36F in the winter
    Maximum temperature of the server air inlet is [90 F], minimum temperature is [36
    F], average temperature is [79.5 F]
    Humidity: Highest 77% Lowest 72%
    Air Pressure: Highest 30.15 Lowest 29.99

2.  **Basic Information of the Power**

    Power type: Nuclear
    Annual electricity price (estimated time percentage of abundant, dry and flat period
    should be marked by installments): N/A
    Usable total load: 1000MW

3.  **Basic Information of the Internet**
    *Note: multiple operators are required to access.*

    Internet operator: Xfinity and secondary backup Earthlink
    Internet bandwidth: Fiber Optics 100/100

4.  **Compliance of the Data Center**

    Project approval documents: No
    Electricity contract: No
    Land license/leasing agreement: No
    Description of the submitting party and beneficiary owner: Publicly Traded USA
    registered Company

5.  **Services Available**

    □Hosting Services
    □Operation Services
    Operation personnel status: Bit5ive LLC

15

For and on behalf of

Bitmain Technologies Georgia Limited
Party A

程 猷

Authorized Signature
Name: Cheng Ran
Title: Director
JULY
23
2021

For and on behalf of
ISW Holdings, Inc.
Party B

Authorized Signature
Name: Alonzo Pierce
Title: CEO

14

Operation equipment status (need to declare if there is monitoring): Properticry monitoring system created by Bit5ive LLC
□Maintenance Services
Maintenance capability: (daily repair quantity depends on the actual situation /only capable of replacing the fan power/and other required maintenance capability, full servicing)

6. **Service Fees**

   1. **Hosting Fees**

      Normal Hosting Unit Price: $0.055 /kWh
      Lowest Hosting Unit Price: According to Clause 3 of Service Framework Agreement
      Payment method: pay in advance
      Description:
      a. To ensure the competitiveness of Party B and to add the possibility that the services of Party B will be used by Party A, the Service Fees shall be in line with the current market mainstream price, and the Lowest Hosting Unit Price shall be the cost electricity price or be close to the cost electricity price.
      b. The price here is tax-inclusive.
      c. If the price is different in different time periods (including in different months and in different time periods of the same day), please specify separately.



**Annex 2: Service Order**

Party A: Bitmain Technologies Georgia Limited
Registration Number: 21203283

Party B: ISW Holdings, Inc.
Address: 50 West Liberty Street, Suite 880
Reno, NV 89501

Whereas, the Parties signed the Service Framework Agreement (the **"Framework Agreement"**) on June 21, 2021, and it is agreed that Party A will entrust Party B to provide Services for normal operation of the Hosted Servers, through friendly negotiation and referring to the data center filing for record information provided by Party B to Party A, both Parties sign this Service Order (the **"Service Order"**) on service matters of specific projects as a supplement to the Framework Agreement, and the Framework Agreement and the Service Order together constitute binding documents that both Parties need to abide by. Unless otherwise specified, all terminology definitions in this Service Order have the same meaning as those in the Framework Agreement

1. **Service Content**

1. The Services under this Service Order includes:

    (1) Hosting Services. If Party B provides Hosting Services, Article 3 of this Service Order shall be applicable.
    (2) Operation Services. If Party B provides Operation Services, Article 4 of this Service Order shall be applicable.
    (3) Maintenance Services. If Party B provides Maintenance Services, Article 5 of this Service Order shall be applicable.

2. The information of the target servers of the Service Order

| Model | Amount (set) | Estimated Arrival Time | Remarks |
|---|---|---|---|
| | | | The specific model, amount, and arrival time are subject to delivery |
| | | | |
| | | | |
| | | | |
| In total | | | |



3. Location of the target mining facility of the Service Order: Georgia, US

4. The Parties agree that the Actual Computing Power of Hosted Servers shall be based on the software monitoring platform designated by Party A.

5. The time of meter reading under the Service Order is at 24:00 of every 4th and 19th day of every month.

6. The hosting fee of Party B is 0.055/kWh, and the payment method of the electricity fees of Party B is to pay in advance. Party B shall provide the evidence documents for its electricity payment method and payment cycle.

## 2. Bill and Payment

1. Bill

   Bill date: the 25th day of every month
   Bill cycle: 0:00 on the 25th day of this month to 24:00 on the 24th day of next month.

2. Payment method

   Party A shall pay in advance to Party B the estimated Hosting Fees for sixty (60) days and the prepayment shall be in two tranches: first, Party A shall pay in advance to Party B the Hosting Fees for thirty (30) days of 20MW within seven (7) days after the execution of the Service Order; second, Party A shall pay in advance to Party B the Hosting Fees for thirty (30) days of the amount of the Servers to be actually delivered seven (7) days prior to the delivery of the Servers by Party A. The afore-mentioned prepayment of the estimated Hosting Fees for sixty (60) days have been paid off by Party A's affiliate and Party A shall not be required to pay such prepayment anymore.

   Party A shall be charged for the Hosting Fees commencing from March 1st, 2022.

   Party B shall submit the Bill to Party A prior to the Bill date. If Party A has any disagreement of the Bill, Party A shall give feedback to Party B in writing within three (3) business days after receiving the Bill. Party B shall provide necessary explanation and corresponding evidence to Party A. The Parties shall actively investigate the cause of the difference and negotiate to solve the problem.

   Party B shall provide to Party A the actual Hosting Fees Bill of 0:00 on the 25th day of last month to 24:00 on the 24th day of this month for Party A's review; and shall issue an invoice equal to the prepaid Hosting Fees of 0:00 on the 25th day of this month to 24:00 on the 24th of next month. If the actual Hosting Fees Bill is inconsistent with the prepaid Hosting Fees of the corresponding bill cycle, the difference shall be adjusted in the aforementioned invoice. The prepaid Hosting Fees shall be calculated based on the amount of the Servers * the theoretical power consumption. Party A shall pay the fees within five (5) business days after receiving the invoice.

   If Party B fails to issue the invoice on time, the Parties may friendly negotiate to delay for fifteen (15) days. And if Party B fails to issue the invoice more than five

18

(5) days after the delayed time, the invoice tax owed by Party B shall be deducted from the next Bill. After Party B issues the delayed invoice, Party A shall pay to Party B the deducted tax.

When the Service Order is terminated, if the actual Service Fees exceeds the pre-payment, Party A shall pay to Party B the difference within five (5) business days after the settlement date; if the actual Service Fees are less than the prepayment, Party B shall pay to Party A the difference within five (5) business days after the settlement date. If the payment is not completed within five (5) business days after the settlement date, late fee in the amount of 0.1% of the payable amount per day shall be paid to the counterparty since the six (6) business day after the settlement date.

3. Account information of Party B

Account Name: [ * ]
Bank Name: [*]
Account Number: [ * ]

3. **Hosting Services**

If Party B provides Hosting Services, <u>Article 3</u> of this Service Order shall be applicable.

1. Data Center Condition

Party B shall ensure that the data center satisfies the following conditions under this Project:

| Area | 154 Hyatt Street, Gaffney, SC 29341 |
|---|---|
| Load capacity | 20 MW |
| Minimum useable computer positions | 5600 miners |
| Temperature scope | 0℃-24℃ |
| Humidity scope | 30%-70% |
| Air pressure scope | 80Kpa |
| Latest date of arriving normal operation environment | October 25 |
| Production and living facilities | Office rooms, maintenance rooms, canteen, dormitory, toilets, warehouse facility |



19

When the Service Order is terminated, if the actual Service Fees exceeds the prepayment, Party A shall pay to Party B the difference within five (5) business days after the settlement date; if the actual Service Fees are less than the prepayment, Party B shall pay to Party A the difference within five (5) business days after the settlement date. If the payment is not completed within five (5) business days after the settlement date, late fee in the amount of 0.1% of the payable amount per day shall be paid to the counterparty since the six (6) business day after the settlement date.

3. Account information of Party B

Account Name: ISW Holding, Inc.[ᵃ]
50 West Liberty Street, Suite 88
Reno, NV 89501

Bank Name: Chase Bank[ᵃ]
Account Number: 707708308[ᵃ]
Routing Number: 267084131
Wire ABA Wire Number: 021000021
Swift Code Number: CHASUS33

3. **Hosting Services**

If Party B provides Hosting Services, <u>Article 3</u> of this Service Order shall be applicable.

1. Data Center Condition

Party B shall ensure that the data center satisfies the following conditions under this Project:

| Area | 22Sq. metres |
|---|---|
| Load capacity | 20 MW |
| Minimum useable computer positions | 5600 miners |
| Temperature scope | 0℃-24℃ |
| Humidity scope | 30%-70% |
| Air pressure scope | 80Kpa |
| Latest date of arriving normal operation environment | October 25 |
| Production and living facilities | Office rooms, maintenance rooms, canteen, dormitory, toilets, warehouse facility |



19



2. Hosting Unit Price

   Normal Unit Hosting Price: $0.055/kWh
   Lowest Unit Hosting Price: $0.055/kWh

4. Operation Services

   If Party B provides Operation Services, Article 4 of this Service Order shall be applicable.
   Definition:
   Qualified Hosted Servers: servers whose average computing power is above 80% in consecutive 8 hours;
   The total number of effective Hosted Servers: means the number of the Hosted Servers running normally on the rack, including qualified Hosted Servers, unqualified Hosted Servers and servers on-rack for less than eight (8) hours.

   1. Operation Unit Price

      (1) Benchmark price (P) is: $0.55/kWh
      (2) Price determined by the qualification rate of the Hosted Servers:
      $$the\ qualification\ rate\ of\ the\ Hosted\ Servers = \frac{number\ of\ the\ qualified\ Hosted\ Servers}{the\ total\ number\ of\ the\ effective\ Hosted\ Servers}$$

| Model | Qualification rate of Hosted Servers | Price Formula |
|---|---|---|
| In reference to 1.2 Service Order Model | above 98% | 1.15*P |
| | 93%-98% (benchmark) | P |
| | 85%-93% | 0.85*P |
| | below 85% | 0.7*P |

      Qualified Hosted Servers: servers whose average computing power is above 80% in consecutive 8 hours;
      The total number of effective Hosted Servers: means the number of the Hosted Servers running normally on the rack, including qualified Hosted Servers, unqualified Hosted Servers and servers on-rack for less than eight (8) hours.

   2. The start date of the Operation Services: October, 2021

   3. Standard of the Operation Services:



20

       . Party B shall remove the unqualified Hosted Server from the rack and start maintenance within eight (8) hours since the detection of such unqualified Hosted Server, which means that the maximum operating time of the unqualified Hosted Server is sixteen (16) hours. If the unqualified Hosted Server is not removed from the rack after eight (8) hours, the theoretical hosting fees per hour per server shall be deducted from the Operation Fees since the 9th hour.

5. Maintenance Services

If Party B provides Maintenance Services, Article 5 of this Service Order shall be applicable.

    1. Party B shall have the maintenance capability of the following　(2)：

       (1) Daily maintenance of 100-200 sets of servers defined in Article 1.2 of Annex 2;
       (2) Only capable of replacing fan power which may be completed within 48] hours after the occurrence of the malfunction; for malfunction beyond the maintenance capability, Party B may send the servers to the maintenance center designated by Party A within 3-5 days after the occurrence of the malfunction.

    2. Maintenance Unit Price

The unit price for the Maintenance Fees: Subject to the actual cost
The unit price above is the fee for the working hours, and the maintenance materials shall be provided by Party A.

    3. Standard of Maintenance Services

One month after the execution of the Service Order, the repair of the unqualified Hosted Server of Party A shall be finished within forty-eight 48 hours if the maintenance is within the maintenance capability of Party B and only includes the replacement of fan and power supply. For malfunction beyond the maintenance capability of Party B, Party B shall send the servers to the maintenance center designated by Party A within 3-5 days after the occurrence of the malfunction.
The warranty period of the Hosted Servers that have been repaired by Party B is seven (7) days, and the repaired and on-rack Hosted Servers will not be included in the maintenance quantity if it is repaired again within seven (7) days.

    4. Special notice

       (1) If Party B fails to satisfy the standard of the Maintenance Services during the cooperation period, Party B shall take part in the maintenance training of Party A at its own expense;
       (2) If Party B fails to satisfy the standard of the Maintenance Services and refuses to take part in the training of Party A, Party B shall bear all the onsite costs of the outsourcing maintenance personnel designated by Party

21

A.

6. Termination of the Service Order

This Service Order may be terminated by the following method 2:

    (1) Party A may send the written notice to terminate this Service Order one month in advance.
    (2) This Service Order may not be terminated prior to Sep 2023. Party B shall continue to provide services after this point until Party A sends a written notice to terminate this Service Order one (1) month in advance.

7. In addition to the aforementioned stipulations, the Parties shall execute rights, obligations and responsibilities of this Service Order in accordance with the Framework Agreement. If there is any conflict between the Service Order and the Framework Agreement, the Service Order shall prevail

8. This Service Order shall become effective on the date of signature and seal by both Parties. Scanned copies, copies and faxes of the signed Service Order shall have the same legal effect as the original ones. This Service Order is in duplicate, with each Party holding one copy, which has the same legal effect.

For and on behalf of
Bitmain Technologies Georgia Limited
Party A

_Authorized Signature_
Name: Cheng Ran
Title: Director

For and on behalf of
ISW Holdings, Inc.
Party B

_Authorized Signature_
Name:
Title:

Case 6:24-cv-03183-MDH   Document 1-2   Filed 06/25/24   Page 24 of 25

## Annex 3: Template of Daily Report on Server Status

| Item | Content | Remarks | Specifications & Notes |
|---|---|---|---|
| Submitted by | | | |
| Item name | | | |
| Date | | | |
| Servers model | | | |
| Quantity of Servers | | | |
| Quantity of power-on servers | | | |
| Quantity of power-off servers (failure) | | | |
| Quantity of unpowered servers (on-site maintenance) | | | |
| Quantity of unpowered servers (sent for maintenance) | | | |
| Quantity of unpowered servers (scrapped and returned) | | | |
| Quantity of unpowered servers (newly arriving) | | | |
| Quantity of off-site servers (not sent) | | | |
| Quantity of off-site servers (in transit) | | | |

)