# EXHIBIT 2



<h1 align="center">SERVICE FRAMEWORK AGREEMENT</h1>

**THIS AGREEMENT** (the "**Agreement**") is made on <u>September 1</u>, 2022 (the "Effective

Date" )

**BETWEEN:**

(1)     **BITMAIN TECHNOLOGIES GEORGIA LIMITED**, a company incorporated
under the laws of the State of Georgia of the United States of America (Company
Registration No. 21203283), having its registered office at 900 Old Roswell Lakes
Parkway, Suite 310, Roswell, GA 30076, USA ("**BITMAIN**"); and

(2) **BLOCKQUARRY CORP.**, formerly ISW Holdings, Inc., a company
incorporated under the laws of Nevada (Entity Number C14805-2001), having its
principal office at 700 Louisiana St, Suite 3950, Houston, Texas 77002 ("**Service
Provider**").

Each of the parties to this Agreement is referred herein individually as a "**Party**" and
collectively as the "**Parties**".

**WHEREAS:**

(A)     Service Provider is the owner and operator of the Data Center Facility (as defined below)
and provides Services (as defined below) at the Data Center Facility.

(B)     BITMAIN intends to locate the Hosted Servers (as defined below) at the Data Center
Facility and receive Services from Service Provider in accordance with the terms and
conditions of this Agreement.

(C)     BITMAIN and Service Provider entered into a Service Framework Agreement with its
all annexes on November 16, 2021 (the "Previous Agreement"), regarding the services
that Service Provider provides to BITMAIN.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants set forth in
this Agreement, the parties agree as follows:

**1.      DEFINITIONS AND INTERPRETATIONS**

1.1.    In this Agreement, these expressions have the following meanings:

"**Actual Computing Power**" means the actual computing power recorded on the
Monitoring Software during the actual operation of the applicable Hosted Server.



"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with such Person.

"**Applicable Law**" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, without limitation, local law, law of any other state or part thereof or international law, and which creates or purports to create any requirement or rule that may affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

"**Average Number of Online Servers**" means the average of Daily Number of Online Servers in the applicable Billing Period.

"**Billing Period**" shall have the meaning ascribed to it in the applicable Service Order.

"**Business Day**" means a day (other than Saturday or Sunday) on which banking institutions in the Relevant Jurisdiction are open generally for business.

"**Control**" means, with respect to any Person, the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, provided that, in the case of a Person that is an entity, such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the holders of the shares or other equity interests or registered capital of such Person or power to control the composition of a majority of the board of directors or similar governing body of such Person. The terms "**Controlled**" and "**Controlling**" have meanings correlative to the foregoing.

"**Daily Number of Online Servers**" means the number of Hosted Servers that has an Online Status on one day.

"**Data Center Facility**" means the data center facility owned and operated by the Service Provider, details of which are set forth in Appendix I, where the Service Provider provides the Services to BITMAIN pursuant to the applicable Service Order(s).

"**Digital Assets Price**" means the price of the applicable digital asset at 10:00 a.m. (Beijing Time) on the day immediately following the applicable date, denominated in US Dollars and published on the website of Coinmarketcap (https://coinmarketcap.com/).

"**End-Period Meter Reading**" means the meter reading of the Separate Meter taken at 23:59 on the last day of the applicable Billing Period.

"**Force Majeure**" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party, which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement,



including to the extent such event or occurrence shall delay, prevent or hinder such Party from performing such obligation, war (declared or undeclared), terrorist activities, acts of sabotage, blockade, fire, lightning, acts of god, national strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, landslides, avalanches, floods, hurricanes, explosions and regulatory and administrative or similar action or delays to take actions of any governmental authority.

"**Hosted Servers**" means the supercomputing servers and ancillary hardware equipment owned by BITMAIN or its designated third party(ies) and hosted at the Data Center Facility pursuant to the applicable Service Order.

"**Hosting Capacity**" shall have the meaning ascribed to it in the applicable Service Order.

"**Hosting Fee**" means the fee for the Hosting Service payable by BITMAIN to Service Provider, which shall be calculated in accordance with Article 4.1.

"**Hosting Fee Ratio**" means the ratio of the Hosting Fee to the aggregate of the Theoretical Computing Power PPS Income during the applicable Billing Period.

"**Hosting Service**" means the service provided by Service Provider, the scope of which are set forth in Part A of Appendix III.

"**Hosting Unit Price**" means the unit price for each kWh of electrical power consumed by the Hosted Servers for provision of Hosting Service by Service Provider.

"**Initial Date**" means the date on which the Hosted Servers under the first Service Order, or the first batch of Hosted Servers if there are more than one batch under the first Service Order, are powered-on for normal hosting and operation.

"**Intellectual Property Rights**" means any and all intellectual property rights, including but not limited to those concerning inventions, patents, utility models, registered designs and models, engineering or production materials, drawings, trademarks, service marks, domain names, applications for any of the foregoing (and the rights to apply for any of the foregoing), proprietary or business sensitive information and/or technical know-how, copyright, authorship, whether registered or not, and any neighbor rights.

"**Inventory Assets**" means any asset stored or kept by BITMAIN at the Data Center Facility other than the Hosted Servers, which may include servers or hardware equipment that are damaged, defective, malfunctioning or not operating, servers or hardware equipment that are backup to the Hosted Servers, the spare parts and components for the maintenance and repair of the Hosted Servers.

"**Minimum Power Commitment**" means the commitment of power consumption of Service Provider pursuant to the applicable Power Purchase Agreement, the failure to utilize of electrical power under which, or the failure to make payment of which



regardless of the actual utilization, will constitute a breach of contract under such Power Purchase Agreement.

"**Minimum Hosting Unit Price**" shall have the meaning ascribed to it in the applicable Service Order.

"**Monitoring Software**" means the software designated by the Parties to monitor the operation of the Hosted Servers, which shall be AntSentry (version V2 or such other version as may be upgraded by BITMAIN from time to time) unless otherwise mutually agreed between the Parties in the applicable Service Order.

"**Normal Hosting Unit Price**" shall have the meaning ascribed to it in the applicable Service Order.

"**Online Percentage**" means the percentage of Average Number of Online Servers divided by the number of Hosted Servers in the applicable Billing Period.

"**Online Status**" means the status of a Hosted Server that is powered-on with constant supply of electrical power, has stable connection with network and is accessible via the Monitoring Software where the status tag "Online" is indicated for such Hosted Server.

"**Operation and Maintenance Fee**" means the fee for the Operation and Maintenance Service payable by BITMAIN to Service Provider, which shall be calculated in accordance with Article 4.3.

"**Operation and Maintenance Services**" means the operation and maintenance service provided by Service Provider, the scope of which are set forth in Part B of Appendix III.

"**Operation and Maintenance Unit Price**" means the unit price for each kWh of electrical power consumed by the Hosted Servers for provision of Operation and Maintenance Services by Service Provider, which shall be set forth in the applicable Service Order.

"**Person**" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity (whether or not having separate legal personality).

"**Power-off Server(s)**" means Hosted Server(s) that is/are powered off voluntarily by BITMAIN pursuant to Article 6.1.

"**Power Consumption**" means the amount of electrical power consumed by the Hosted Servers during each Billing Period, which shall be determined by subtracting the End-Period Meter Reading of the Billing Period immediately preceding the relevant Billing Period from the End-Period Meter Reading of the relevant Billing Period, the unit of which shall be kWh.

v4.0

"**Power Purchase Agreement**" means the power purchase agreement, or other similar agreement for procurement of electrical power for the Data Center Facility, entered into between the Service Provider and the relevant power supplier of the Data Center Facility.

"**Rated Computing Power**" means the rated computing power stated on the factory label of the applicable Hosted Server.

"**Rated Power Consumption**" means the amount of the rated electrical power consumption stated on the factory label of the applicable Hosted Server.

"**Reconciliation Statement**" means the statement issued by Service Provide to BITMAIN every Billing Period for reconciliation between the Parties, which shall set out details including but not limited to Power Consumption, the applicable Hosting Unit Price, Service Fees chargeable, any occurrence of interruption or suspension of any Service during such Billing Period, the form of which statement is set out in Appendix VI.

"**Relevant Jurisdiction**" means the State of Georgia, USA.

"**Repair Fee**" means the fee for the Repair Service payable by BITMAIN to Service Provider, details of which is set forth in the applicable Service Order.

"**Repair Service**" means the hosting service provided by Service Provider, the scope of which are set forth in Part C of Appendix III.

"**Separate Meter**" means the separate meter installed at the Data Center Facility for metering the electrical power consumed by the Hosted Servers.

"**Service(s)**" means the service(s) provided by Service Provider to BITMAIN pursuant to this Agreement, which may include Hosting Service, Operation and Maintenance Service and/or Repair Service subject to the actual service(s) agreed between the Parties in the applicable Service Order.

"**Service Fee**" means fee for the Services payable by BITMAIN pursuant to this Agreement, which may include, as applicable, the Hosting Fee, Operation and Maintenance Fee, and/or Repair Fee subject to the agreed Service(s) in the applicable Service Order.

"**Service Order(s)**" means the Service Order(s) executed by the Parties in the form set out in Appendix II, as amended from time to time in accordance with this Agreement.

"**Theoretical Computing Power PPS Income**" means, on a daily basis, the theoretical earnings of the applicable Hosted Server based on the Rated Computing Power of such Hosted Server with reference to the prevailing network difficulty during the relevant period, which, for the purpose of this Agreement, shall be the PPS data published on the website of BTC.com Mining Profit Calculator



(https://explorer.btc.com/btc/adapter?type=mining-calculator) from 10:00 a.m. of the previous day to 10:00 a.m. of the day (Beijing Time).

"**Theoretical Hosting Fee**" means the theoretical amount of the Hosting Fee for one full Billing Period, which shall be calculated in accordance with Article 4.3.

1.2. In this Agreement, unless otherwise specified:

(i) words importing the singular include the plural and vice versa where the context so requires;

(ii) the headings in this Agreement are for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement;

(iii) references to Articles and Appendix(es) are references to the articles and appendix(es) of this Agreement;

(iv) references to days, dates and times are to the days, dates and times of the Relevant Jurisdiction, unless otherwise indicated;

(v) any reference to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re-enactment or amendment thereof for the time being in force; and

(vi) "**$**", "**US$**", "**US dollar**", "**US dollars**", "**dollar**" and "**dollars**" denote lawful currency of the United States of America.

## 2. TERMINATION OF THE PREVIOUS AGREEMENT

2.1. The Parties mutually agree to terminate the Previous Agreement as of the Effective Date and, as a result of such termination, the Parties hereby acknowledge and agree that, their respective rights and obligations under the Previous Agreement are hereby terminated as of the Effective Date and that both Parties shall have no further liability to each other under the Previous Agreement or with respect to the Previous Agreement, except as expressly set forth in this Agreement.

2.2. Upon the Effective Date, all rights and obligations of the Parties under the Previous Agreement shall terminate, except those described in the following Articles and Articles of the Previous Agreement: Article 7 (Termination of this Agreement and the Service Order), Articles 8 (Confidentiality Clause), Article 12 (Governing Law and Dispute Resolution) and all applicable provisions which by their nature shall be survive after such termination.

2.3. By the termination of the Previous Agreement, the Parties release each other from any and all claims, cause of actions, demands and liabilities of whatever nature which either Party had in the past, has now or may have in the future arising from the Previous Agreement.

Case 6:24-cv-03183-MDH   Document 1-3   Filed 06/25/24   Page 7 of 29



2.4.   The amount of deposit paid by BITMAIN to Service Provider on July 14, 2021 according to Article 2.2 (Payment Method) of Annex 2 under Previous Agreement shall be deemed as the deposit under this Agreement in accordance with Article 4.6. Parties acknowledge and agree that any and all the prepayments paid by BITMAIN to Service Provider according to Article 2.2 (Payment Method) of Annex 2 under Previous Agreement were fully settled.

**3.   SCOPE OF SERVICES**

Subject to the terms and conditions of this Agreement, Service Provider shall provide to BITMAIN, and BITMAIN shall receive from Service Provider, the Services agreed in each of the applicable Service Orders, which may include Hosting Service, Operation and Maintenance Service, and/or Repair Service, or any combination thereof.

**4.   SERVICE FEE AND PAYMENT**

4.1.   <u>Hosting Fee Calculation</u>. Hosting Fee for each Billing Period shall be calculated as follows:

**Hosting Fee = Power Consumption × Hosting Unit Price**

4.2.   <u>Hosting Unit Price Adjustment</u>. Under each Service Order, the initial Hosting Unit Price shall be the Normal Hosting Unit Price set forth in such Service Order, subject to the following adjustment for each Billing Period:

(a)   *Price Maintenance*. If the Hosting Fee Ratio for such Billing Period is higher than 60% but no higher than 90%, the Hosting Unit Price applicable to such Billing Period shall equal to the Normal Hosting Unit Price set forth in such Service Order.

(b)   *Downward Adjustment*. If the Hosting Fee Ratio for such Billing Period is higher than 90%, the Hosting Unit Price applicable to such Billing Period shall be adjusted to the higher of:

(i)   an amount equal to the result of (x) 80% of aggregate of the Theoretical Computing Power PPS Income during such Billing Period, divided by (y) Power Consumption of such Billing Period; or

(ii)   the Minimum Hosting Unit Price,

(c)   *Upward Restoration*. In the event that (i) the Hosting Unit Price is lower than the Normal Hosting Unit Price, and (ii) the Hosting Fee Ratio for such Billing Period is no higher than 60%, the Hosting Unit Price applicable to such Billing Period shall be adjusted to the lower of:


> (i)     an amount equal to the result of (x) 80% of aggregate of the Theoretical Computing Power PPS Income during such Billing Period, divided by (x) Power Consumption of such Billing Period; or
>
> (ii)    the Normal Hosting Unit Price.

4.3.    <u>Operation and Maintenance Fee</u>. Operation and Maintenance Fee for each Billing Period shall be calculated as follows:

**Operation and Maintenance Fee = Power Consumption × Operation and Maintenance Unit Price**

4.4.    <u>Repair Fee</u>. *[Not Applicable]*

4.5.    <u>Other One-off Fees</u>. Other one-off fees set forth in the applicable Service Order shall be paid in accordance with such Service Order.

4.6.    <u>Deposit</u>.

> (a)     According to Article 2.2 (Payment Method) of Annex 2 under Previous Agreement, BITMAIN has paid a deposit on July 14, 2021 to Service Provider in the amount of US$[756,000], representing one (1) month's Theoretical Hosting Fee calculated on a power capacity of 15MW at the normal hosting unit price under the Previous Agreement for 24 hours, 30 days: US$[756,000] = 15MW × $[0.07] × 24 Hours × 30 Days × 1 Month. BITMAIN and Service Provider agree that the deposit shall be deemed as the deposit under this Agreement (the "**Deposit**") from the Effective Date.
>
> (b)     The Deposit shall be returned to BITMAIN within seven (7) Business Days from the date of the last invoice.

4.7.    <u>Prepayment</u>. Prepayments shall be made by BITMAIN to Service Provider as follows:

> (a)     <u>Initial Prepayment</u>. Within seven (7) calendar days from the date of the execution of the Agreement or other date agreed by Parties, BITMAIN shall make a prepayment equal to the amount of the Theoretical Hosting Fee calculated as follows:
>
> **Theoretical Hosting Fee = Hosting Capacity × Normal Hosting Unit Price × 24 Hours × Number of Days in the First Full Billing Period**
>
> (b)     <u>Subsequent Prepayment</u>. For each subsequent Billing Period, within seven (7) Business Days from the date of the invoice of the previous Billing Period, BITMAIN shall make a prepayment equal to the amount of the Theoretical Hosting Fee for such subsequent Billing Period calculated as follows:



**Theoretical Hosting Fee = Hosting Capacity × Hosting Unit Price of the Previous Billing Period × 24 Hours × Number of Days in Such Subsequent Billing Period**

4.8. <u>Reconciliation</u>.

    (a)    Service Provider shall furnish to BITMAIN the Reconciliation Statement for the previous Billing Period within seven (7) Business Days from the end of such previous Billing Period. BITMAIN may raise to Service Provider any objection to the Reconciliation Statement, with data and records supporting such objection, within seven (7) Business Days upon its receipt of the Reconciliation Statement, failing which BITMAIN shall be deemed to have approved the Reconciliation Statement.

    (b)    In the event of any objection raised by BITMAIN, the Parties shall diligently and expeditiously work towards resolving the discrepancies between the Reconciliation Statement and the supporting data and records provided by BITMAIN. The final determination shall be made by the onsite operation and maintenance staff of BITMAIN on the basis of the actual power consumption, which shall not exceed the amount of the Rated Power Consumption. Upon successful resolution of the discrepancies, Service Provider shall furnish to BITMAIN a revised version of the Reconciliation Statement and BITMAIN shall approve such revised version in writing within seven (7) Business Days upon receipt.

4.9. <u>Invoice</u>. Upon approval of the Reconciliation Statement, or the revised version as applicable, Service Provider will issue the invoice of the Service Fees for the previous Billing Period:

    (a)    if the amount of Hosting Fee in the invoice equals to the Theoretical Hosting Fee prepaid in accordance with Article 4.3, the Hosting Fee in the invoice shall be regarded as fully settled on the date of the invoice;

    (b)    if the amount of Hosting Fee in the invoice is less than the Theoretical Hosting Fee prepaid in accordance with Article 4.7, the Hosting Fee in the invoice shall be regarded as fully settled on the date of the invoice and the Service Provider shall remit the portion of difference between the prepayment and the invoice amount to BITMAIN no later than seven (7) Business Days from the date of the invoice;

    (c)    if the amount of the Hosting Fee in the invoice is more than the Theoretical Hosting Fee prepaid in accordance with Article 4.7, BITMAIN shall pay to Service Provider the shortfall between the prepayment and the amount of Hosting Fee in the invoice no later than seven (7) Business Days and the Hosting Fee in the invoice shall be regarded as fully settled upon BITMAIN's payment of such shortfall; and



(d)     any amount of the Operation and Maintenance Fee and/or Repair Fee in the invoice shall be paid by BITMAIN to Service Provider no later than seven (7) Business Days from the date of the invoice.

4.10.   <u>Incentive Bonus</u>. BITMAIN shall make a payment of incentive bonus ("**Incentive Bonus**") to Service Provider, the amount of which shall equal to 5% of the Hosting Fee of such Billing Period, in the event that Online Percentage of such Billing Period is no less than 99.5%.

4.11.   <u>Hosting Fee Reward</u>. Following any upward restoration of the Hosting Unit Price pursuant to Article 4.2 错误!未找到引用源。, in the event that the Hosting Unit Price has been restored to the Normal Hosting Unit Price and the Hosting Fee Ratio is lower than 60%, BITMAIN shall make a payment of reward ("**Hosting Fee Reward**") to Service Provider in an amount equal to the difference between (i) the actual Hosting Fee incurred during the period when the Hosting Unit Price is lower than the Normal Hosting Unit Price, and (ii) the hypothetical Hosting Fee that would incur during such period assuming the Hosting Unit Price equals to the Normal Hosting Unit Price, *provided that*, the amount of the Hosting Fee Reward shall be capped at the result of (A) 80% of the aggregate of the Theoretical Computing Power PPS Income during that Billing Period, minus (B) the Hosting Fee during that Billing Period calculated based on the Normal Hosting Unit Price.

4.12.   <u>Payment Method</u>. All payment pursuant to this Agreement, including any remittance or refund, shall be made via wire transfer of immediately available funds in the US Dollars to the bank account of designated by the receiving Party.

**5.      REPRESENTATIONS AND WARRANTIES**

Each of the Parties hereby makes the following representations and warranties to the other Party:

5.1.    It has the full power and authority to own its assets and carry on its businesses.

5.2.    The obligations expressed to be assumed by it under this Agreement are legal, valid, binding and enforceable obligations.

5.3.    It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement.

5.4.    The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with:

(a)     any Applicable Law;

(b)     its constitutional documents; or

Case 6:24-cv-03183-MDH   Document 1-3   Filed 06/25/24   Page 11 of 29



(c) any agreement or instrument binding upon it or any of its assets.

5.5. All authorizations required or desirable:

(a) to enable it to lawfully enter into, exercise its rights under and comply with its obligations under this Agreement;

(b) to ensure that those obligations are legal, valid, binding and enforceable; and

(c) to make this Agreement admissible in evidence in its jurisdiction of organization,

have been, or will have been by the time, obtained or effected and are, or will by the appropriate time be, in full force and effect.

5.6. It is not aware of any circumstances which are likely to lead to:

(a) any authorization obtained or effected not remaining in full force and effect;

(b) any authorization not being obtained, renewed or effected when required or desirable; or

(c) any authorization being subject to a condition or requirement which it does not reasonably expect to satisfy or the compliance with which has or could reasonably be expected to have a material adverse effect.

## 6.    VOLUNTARY POWER-OFF

6.1. At any time when the applicable Hosting Unit Price is at the Minimum Hosting Unit Price, and if the ratio of the Hosting Unit Price to the Theoretical Computing Power PPS Income has remained at 90% or higher for a consecutive of 72 hours, BITMAIN shall be entitled to voluntarily power off any or all of the Hosted Servers in its sole discretion.

6.2. Any Power-off Server may remain on rack at the Data Center Facility for a period of 15 calendar days (exclusive of the first day on which such Power-off Server is powered off), during which period BITMAIN may at any time re-power on such Hosted Server in its sole discretion (the "**Voluntary Power-off Period**").

6.3. During the Voluntary Power-off Period:

(a) BITMAIN shall not be liable to pay to Service Provider any fee, charges or expenses whatsoever, regardless of whether there is a Minimum Power Commitment or not; and

(b) if there is a Minimum Power Commitment, Service Provider may, in its sole discretion, power on any Power-off Servers to fulfill its obligation of the Minimum Power Commitment, *provided that* Service Provider shall be solely responsible for any cost and exchanges of operating the Power-off Hosted.

Case 6:24-cv-03183-MDH   Document 1-3   Filed 06/25/24   Page 12 of 29


7. **OPERATION ENVIRONMENT OF DATA CENTER FACILITY**

7.1. <u>Conditions of the Data Center Facility</u>. No later than the Initial Date and at all times up to and until the termination of this Agreement, Service Provider shall provide BITMAIN with sufficient server positions, racks, power load and facilities, broadband network and network facilities, security monitoring and other equipment reasonably required for the normal operation of the Hosted Servers.

7.2. <u>Exclusive Server Room</u>. Service Provider shall provide exclusive server room(s) for the storage and operation of the Hosted Servers, which shall be physically separated from server rooms at the Data Center Facility for use by other customers of Service Provider. No server and/or other hardware equipment other than the Hosted Servers may be allowed in such exclusive server room(s) unless with prior written approval of BITMAIN.

7.3. <u>Unfilled Space in Exclusive Server Room</u>. If any exclusive server room cannot be filled up with Hosted Servers, subject to BITMAIN's prior written consent, Service Provider may deploy its or its other customers' servers and/or hardware equipment ("**Third Party Servers**") in such unfilled server room, *provided that:*

    (a) prior to the actual deployment, appropriate measures shall have been taken by Service Provider at its own costs to ensure of the Third Party Servers are reasonably isolated and separated from the Hosted Servers, and such measures shall be maintained at all times up to and until the removal of all Third Party Servers from the relevant exclusive server room; and

    (b) at all times up to and until the removal of all Third Party Servers from the relevant exclusive server room, safety and security of the Hosted Servers shall not be comprised due to the deployment of the Third Party Servers.

7.4. <u>Standard Hosting Environment</u>. Service Provider shall maintain the standard hosting environment for the Hosted Servers in accordance with the conditions set forth in the applicable Service Order.

7.5. <u>Title and Ownership</u>. Service Provider warrants and represents that it has have good title to, or right by license, lease or other agreement to use, the Data Center Facility, and there is no actual, pending or threated dispute or other claim as to title and ownership of the Data Center Facility.

7.6. <u>Safety and Security</u>. Server Provider shall take all necessary measures to ensure safety and security of the Data Center Facility and the Hosted Servers against any damage, loss or fire outbreak, etc.

7.7. <u>Compliance with Applicable Law</u>. Service Provider shall ensure that the operation of the Data Center Facility, the individuals of Service Provider and provision of Services is at all times in compliance with Applicable Laws and that any and all applicable



approvals, certificates, orders, authorizations, permits, qualifications and consents required for the operation of the Data Center Facility and provision of Services have been obtained no later than the Initial Date and are not revoked, cancelled or expired (unless properly renewed on or prior to such expiry) up to and until the termination of this Agreement.

7.8.  24/7 Access by BITMAIN Personnel. BITMAIN may appoint one or more individuals ("**BITMAIN Personnel**") to carry out operation and maintenance activities on the Hosted Servers onsite at the Data Center Facility on a 24-hour per day, 7-day per week basis. Service Provider shall grant BITMAIN Personnel access and permit to:

(a)  enter into the Data Center Facility;

(b)  obtain the operational data of the Hosted Servers;

(c)  inspect the operational conditions of the Data Center Facility;

(d)  perform maintenance on the Hosted Servers;

(e)  handle or repair any Hosted Servers that may be damaged, defective, malfunctioning or not operating; and

(f)  check and examine the Hosted Servers and Inventory Assets.

7.9.  Online Percentage.

(a)  Service Provider shall ensure that the Online Percentage in each Billing Period is no less than 95%, unless such below-95% Online Percentage is caused solely by the defects of the Hosted Servers or the inappropriate operation of the Hosted Servers by BITMAIN Personnel.

(b)  If the Online Percentage for any Billing Period is less than 95% (but no less than 90%) due to any substandard condition of the Data Center Facility, including but not limited to, power connection, network connection, heat dissipation and/or water purification, Service Provider shall have a period of one (1) month to remedy such substandard condition.

(c)  If the Online Percentage for the Billing Period immediately after the one-month remedial period continues to be less than 95% (but no less than 90%), BITMAIN shall be entitled to (i) terminate this Agreement with immediate effect, or (ii) a reduce of the Hosting Unit Price of 5% with effect from the expiry of the Remedial Period up to and until the Online Percentage for a Billing Period is no less than 95%;

(d)  If the Online Percentage for any Billing Period is less than 90% due to any substandard conditions of the Data Center Facility, including but not limited to,

Case 6:24-cv-03183-MDH   Document 1-3   Filed 06/25/24   Page 14 of 29



power connection, network connection, heat dissipation and/or water purification:

(i) BITMAIN shall be entitled to a reduce of the Hosting Unit Price of 10% with effect from such Billing Period and up to and until the Online Percentage for a Billing Period is no less than 90%; and

(ii) Service Provider shall have a period of 30 calendar days to remedy such substandard conditions, and if the Online Percentage for the Billing Period immediately after the 30-day remedial period continues to be less than 90%, BITMAIN shall be entitled to terminate this Agreement with immediate effect.

7.10. Inventory Storage. In addition to the space for hosting of the Hosted Servers, Service Provider shall provide sufficient space to BITMAIN for storage and safe-keeping of Inventory Assets, *provided that* the number of Inventory Assets that BITMAIN may store and keep at Data Center Facility shall not be more than 1% of the number of the Hosted Servers. For the purpose of this Article, the number of Inventory Assets refers to the number of whole servers and equipment hardware and the number of servers and equipment hardware which the spare parts and components may be assembled into or installed on.

7.11. Electricity Outage. Service Provider shall ensure continuous electrical power supply for the Hosted Servers. In the event there are 15 days of electricity outage on an accumulative basis during one Billing Period, BITMAIN shall be entitled to remove all or any of the Hosted Servers from the Data Center Facility.

## 8. INSURANCE

8.1. BITMAIN agrees to keep, or procure the owner of the Hosted Servers (as applicable) to keep, in full force and effect during the Term of this Agreement appropriate commercial general liability insurance and property insurance covering the Hosted Servers, at the expense of the applicable owner of the Hosted Servers.

8.2. In the event of any damage or loss of the Hosted Servers and upon request of BITMAIN, Service Provider shall provide BITMAIN and/or the owner of the Hosted Servers (as applicable) with documents and information in support of the insurance claim made to the insurance company.

8.3. In the event of any damage or loss of the Hosted Servers caused by or results from the negligence or willful misconduct of Service Provider and that the insurance is unavailable or insufficient to cover the losses of BITMAIN and/or the owner of the Hosted Servers (as applicable), Service Provider shall be liable to compensate BITMAIN (for and on behalf of the owner of the Hosted Servers, as applicable) the gap between the insurance coverage, if any, and such losses.

Case 6:24-cv-03183-MDH   Document 1-3   Filed 06/25/24   Page 15 of 29



**9. FORCE MAJEURE**

9.1. A Party shall not be considered to be in default or breach of this Agreement and shall be excused from performance or liability for damages to the other Party, if and to the extent that the performance of any obligation of such Party under this Agreement (other than an obligation to make payment) is prevented, frustrated, hindered or delayed as a consequence of an event of Force Majeure, *provided* that:

    (a) such Party claiming to benefit under this Article 9.1 (the "**Affected Party**") shall:

        (i) immediately and in any event no later than 24 hours from the occurrence of such event of Force Majeure, give the other Party (the "**Non-Affected Party**") a written notice setting out details of such event of Force Majeure; and

        (ii) within three (3) days from the occurrence of such event of Force Majeure, produce to the Non-Affected Party supporting materials evidencing such event of Force Majeure and how its occurrence prevented, frustrated, hindered or delayed the performance of the Affected Party's obligation under this Agreement; and

    (b) the Affected Party shall take all necessary measures to mitigate the impact of such event of Force Majeure and shall resume normal performance of this Agreement promptly after the removal of such event of Force Majeure, unless it is impracticable or unnecessary to resume the performance of this Agreement.

9.2. If the normal performance of this Agreement cannot be resumed within 15 calendar days from the occurrence of such event of Force Majeure, the Non-Affected Party shall be entitled to terminate this Agreement with immediate effect.

**10. TERM AND TERMINATION**

10.1. <u>Term</u>. This Agreement shall have a term effective from the date hereof and expiring on the second (2nd) anniversary of the Initial Date (the "**Term**").

10.2. <u>Right of Renewal</u>. BITMAIN may indicate its intention to renew this Agreement by giving Service Provider a written notice (the "**Renewal Notice**") of no later than 30 days prior to the expiry of the Term. Upon delivery of the Renewal Notice to Service Provider, unless Service Provider has received an irrevocable offer on terms better than this Agreement and BITMAIN confirms its intention not to make a counteroffer on the same terms of such irrevocable offer, this Agreement shall be automatically renewed for a period of two (2) years from the date of expiry of the Term.

10.3. <u>Termination</u>. This Agreement may be terminated prior to the expiry of the Term:

    (a) upon mutual agreement in writing of the Parties;



(b) upon either Party giving a written notice of no less than 60 calendar days to the other Party, *provided that* a compensation in an amount of one (1) month's Theoretical Hosting Fee shall be paid by this Party to such other Party upon termination;

(c) upon either Party giving a written notice to the other Party if such other Party (i) files in any court or agency pursuant to any Applicable Law, a petition in bankruptcy or insolvency or for reorganization or for an arrangement or for the appointment of a receiver or trustee of such other Party or of its assets, (b) is served with an involuntary petition against it, filed in any insolvency proceeding that is not dismissed within ninety (90) days after the filing thereof, (c) makes an assignment of the assets associated with this Agreement for the benefit of its creditors, or (d) fails to maintain or renew any material business registration license, approval or permit that is required under any Applicable Law to carry out its normal business;

(d) upon BITMAIN giving a written notice to Service Provider to terminate pursuant to Article 7.9(c), Article 7.9(d)(ii), Article 14.3 or other applicable articles; and

(e) upon the Non-Affected Party giving a written notice to the other Party to terminate pursuant to Article 9.2.

## 11. CONFIDENTIALITY

11.1. From the date of this Agreement until the fifth (5th) year anniversary of the expiry of the Term or the earlier termination pursuant to Article 10.3, each Party hereby agrees that it will, and will cause its Affiliates and its and their respective directors, officers, employees, professional advisors, agents and other Persons acting on their behalf (collectively, "**Representatives**") to hold, in strict confidence the terms and conditions of this Agreement, all exhibits and schedules attached hereto and the Transactions, including their existence, and all non-public records, books, contracts, instruments, computer data and other data and information, whether in written, verbal, graphic, electronic or any other form, provided by any other Party and its Representatives (except to the extent that such information has been (a) already in such Party's possession prior to the disclosure or obtained by such Party from a source other than any other Party or its Representatives, provided that, to such Party's knowledge, such source is not prohibited from disclosing such information to such Party or its Representatives by a contractual, legal or fiduciary obligation to any other Party or its Representatives, (b) in the public domain through no breach of the confidentiality obligations under this Agreement by such Party, or (c) independently developed by such Party or on its behalf) (the "**Confidential Information**").

11.2. Notwithstanding the foregoing, each Party may disclose the Confidential Information (i) to its Affiliates and its and their respective Representatives so long as such persons are subject to appropriate nondisclosure obligations, (ii) as required by applicable Law


(including securities Laws and applicable securities exchanges rules) or requests or requirements from any Governmental Authority or other applicable judicial or Governmental Order, or in connection with any enforcement of, or dispute with respect to or arising out of, this Agreement, or (iv) with the prior written consent of the other Party.

11.3. The content of this Agreement and any information that belongs to but not disclosed by the other Party in the course of signing or performing this Agreement through public channels are confidential information under this Agreement; without prior written consent of the Party who is entitled to disclose the confidential information, the Party who obtains the confidential information shall not give such confidential information to any third party, nor shall the Party who obtains the confidential information uses it for purposes other than those stipulated in this Agreement.

11.4. This Article 11 shall survive termination of this Agreement.

## 12. INJUNCTIVE RELIEF

12.1. Service Provider acknowledge that monetary damages may not provide a remedy in the event of certain breach of Service Provider's obligations to this Agreement and therefore, in addition to any other rights of BITMAIN, Service Provider grants to BITMAIN the right to enforce this Agreement by means of injunction, both mandatory (specific performance) and preventive, without the necessity of obtaining any form of bond or undertaking whatsoever, and waives any claim or defense that damages may be adequate or otherwise preclude injunctive relief.

## 13. NOTICES

13.1. All notices, requirements, requests, claims, and other communications in relation to this Agreement shall be in writing, and shall be given or made by delivery in person, by an internationally recognized overnight courier service, by registered or certified mail (postage prepaid, return receipt requested) or electronic mail to the respective Parties at the addresses specified below or at such other address for a Party as may be specified in a notice given in accordance with this Article 13.1.

13.2. The following are the initial address of each Party:

**If to Service Provider:**

Address:     700 Louisiana St, Suite 3950, Houston, Texas 77002

Attn:        Alonzo Pierce

Email:       ap@iswholdings.com

**If to BITMAIN:**


| Address: | 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076, USA |
|---|---|
| Attn: | Legal Department |
| Email: | legal@bitmain.com |

## 14. ANTI-COMMERCIAL BRIBERY

14.1. Service Provider shall not, and shall procure its directors, officers, employees, consultants, agents and other representatives (collectively with Service Provider, the "**Service Provider Associates**") not to, directly or indirectly engage in any activity of commercial bribery, i.e. providing any unjustified interests in any form including but not limited to cash, cheque, credit card gifts, negotiable securities (including bonds and stocks), physical objects (including all kinds of high-end household goods, luxury consumer goods, handicrafts and collections, as well as housing, vehicles and other commodities), entertainment coupon, membership card, currency or rebate in the form of goods, kickback, non-property interests such as schooling, honor, special treatment, and employment for relatives and friends, traveling, entertaining and personal service etc. to any director, officer, employee, consultant, agent and other representative of BITMAIN (collectively, "**BITMAIN Associates**")in order to obtain the any immediate or future business opportunity with BITMAIN whether under this Agreement or any other business relationship, regardless of whether such unjustified interests is provided on the own initial of Service Provider Associates or in response to explicit or implicit request of BITMAIN Associates.

14.2. If any of BITMAIN Associates explicitly or implicitly requests commercial bribes, Service Provider shall immediately notify BITMAIN of such activity with relevant evidence and cooperate with BITMAIN in its investigation.

14.3. If any of Service Provider Associates commits commercial bribes in contravention of Article 14.1, BITMAIN shall be entitled to terminate this Agreement and any other existing business cooperation with Service Provider and claim for damages against Service Provider.

## 15. GENERAL

15.1. <u>Entire Agreement and Amendment</u>. This Agreement, together with all Services Orders, appendices, schedules, annexes and exhibits, constitute the full and entire understating and agreement between the Parties, and supersede all other agreements between or among any of the Parties with respect to the subject matters hereof and thereof. This Agreement may only be amended with the written consent of both Parties or otherwise as mutually agreed by both Parties.

15.2. <u>Assignment</u>.

    (a)    BITMAIN may freely assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part to its Affiliates or to any third party.



(b)     Service Provider may assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part subject to BITMAIN's prior written consent.

(c)     This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

15.3.   <u>Governing Law</u>. This Agreement shall be solely governed by and construed in accordance with the laws of the Relevant Jurisdiction, without regard to principles of conflict of laws.

15.4.   <u>Dispute Resolution</u>. All disputes arising under this Agreement shall be submitted to arbitration in Houston, Texas before a single arbitrator of the American Arbitration Association ("<u>AAA</u>"). The arbitrator shall be selected by application of the rules of the AAA, or by mutual agreement of the parties, except that such arbitrator shall be an attorney admitted to practice law in the Relevant Jurisdiction. No party to this agreement will challenge the jurisdiction or venue provisions as provided in this section. No party to this agreement will challenge the jurisdiction or venue provisions as provided in this section. Nothing contained herein shall prevent the party from obtaining an injunction. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.

15.5.   <u>Severability</u>. In case any provision of the Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. If, however, any provision of this Agreement shall be invalid, illegal or unenforceable under any Applicable Law in any jurisdiction, it shall, as to such jurisdiction, be deemed modified to conform to the minimum requirements of such Applicable Law, or, if for any reason it is not deemed so modified, it shall be invalid, illegal or unenforceable only to the extent of such invalidity, illegality or limitation on enforceability without affecting the remaining provisions of this Agreement, or the validity, legality or enforceability of such provision in any other jurisdiction.

15.6.   <u>Counterparts</u> This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile and e-mailed copies of signatures shall be deemed to be originals for purposes of the effectiveness of this Agreement.

*[The remainder of this page is intentionally left blank for signature]*



## APPENDIX I
## INFORMATION MEMORANDUM OF DATA CENTER FACILITY

Service Provider: BlockQuarry Corp.
Submission Date: [September 1st], 2022

| BASIC INFORMATION | | | | | | | |
|---|---|---|---|---|---|---|---|
| Location | 154 HYATT ST, GAFFNEY, SC 29341 | | | | | | |
| Jurisdiction | Georgia, U.S. | | | | | | |
| Land Area (sq. m) | 12,140 sq. meters | | | | | | |
| Building Area (sq. m) | Not applicable | | | | | | |
| Construction Structure | ☐ Steal Structure  ☐ Warehouse  ☒ Container | | | | | | |
| Designed No. of Racks | 16 racks, 10 shelves per container | | | | | | |
| Heat Dissipation Method | ☐ Hydro Cooling  ☒ Air Cooling | | | | | | |
| Local Temperature (°C) | Max. | 30 | Min. | 0 | Avg. | 18 | |
| Server Air Inlet Temperature (°C) | Max. | | Min. | | Avg. | | |
| Humidity (%) | | | | | | | |
| Air Pressure (kPa) | | | | | | | |

| ELECTRICAL POWER | |
|---|---|
| Power Type | ☐Grid hybrid ☐ Wind ☐ Solar ☐ Hydro ☐ Nuclear |
| Electricity Cost (US$ / kWh) | 0.055 |
| Max. Power Capacity (MW) | 20 |

| NETWORK | |
|---|---|
| Network Operator | AT&T and Spectrum |
| Network Bandwidth, Mb/s | Fiber internet 1gbps |

| COMPLIANCE STATUS | |
|---|---|
| Project Approval Documents | ☐ Not Available<br>☒ Provided to BITMAIN on [8/7/2021] |
| Power Purchase Agreement(s) | ☒ Not Available<br>☐ Provided to BITMAIN on [mm/dd/yyyy] |
| Land Title Document | ☒ Not Available<br>☐ Land Ownership Certificate OR ☐ Lease Agreement OR ☐ Land License Agreement provided to BITMAIN on [mm/dd/yyyy] |
| Ultimate Beneficiary Owner of Data Center Facility | Litchain Corp. |



## APPENDIX II
## FORM OF SERVICE ORDER

Date: [September 1st, 2022]

This is a Service Order under the Service Framework Agreement dated effective September 1, 2022 (the "**Service Framework Agreement**") between **Bitmain Technologies Georgia Limited**, a company incorporated under the laws of the State of Georgia of the United States of America (Company Registration No. 21203283), having its registered office at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, GA 30076, USA ("**BITMAIN**") and Blockquarry Corp., formerly ISW Holdings, Inc., a company incorporated under the laws of Nevada (Entity Number C14805-2001) , having its principal office at 700 Louisiana St, Suite 3950, Houston, Texas 77002 ("**Service Provider**"). Unless otherwise specified, capitalized terms used herein shall have the same meaning as those defined in the Service Framework Agreement.

1. **SERVICES AND FEES**

1.1. The Services under this Service Order and the applicable Service Fee are as follows:

⊠ **Hosting Service**

Normal Hosting Unit Price: US$0.07/kWh (including tax)
Lowest Hosting Unit Price: US$0.055/kWh (including tax) (" **Minimum Hosting Unit Price**")

⊠ **Operation and Maintenance Service**

Operation and Maintenance Unit Price: US$[0 ]/kWh

☐ **Repair Service**

N/A

1.2. Other One-off Fees. BITMAIN shall pay the following fees as per use

(a) On-rack fee: US$20 per unit

(b) De-rack fee: US$20 per unit

(c) Others (please specify): N/A

2. **CAPACITY AND SERVERS**

2.1. Under this Service Order, Service Provider agree to provide to BITMAIN power capacity of no less than 15MW or number of server racks of no less than 4,513 together with the necessary onsite production and living facilities including office rooms, maintenance rooms, canteen, dormitory and toilets.



2.2. Details of the Hosted Servers hereunder are as follows, subject to the specific model, rated computing power, rated power consumption and quantity of the Hosted Servers actually delivered to the Data Center Facility:

| Model | Rated Computing Power | Rated Power Consumption | Quantity | Estimated Arrival Date |
|---|---|---|---|---|
| S19j Pro | | | 4,513 | Arrived |
| | | | | |
| | | | | |
| | | | | |
| **Total** | | | 4,513 | / |

2.3. Service Provider shall ensure that the Data Center Facility has been connected to electrical power and reaches its standard operational conditions for the Hosted Servers to power-on on or before [September 1 ], 2022 (each, an "**Initial Date**").

2.4. Location of the Data Center Facility:

154 HYATT ST, GAFFNEY, SC 29341

**3.    BILLING AND PAYMENT**

3.1. Billing Period of this Service Order shall be 00:00 on the first day of each calendar month to 23:59 on the last day of such calendar month.

3.2. The initial prepayment for this Service Order shall be made on or before [November/30/2022]. For the ease of reference, the amount of the initial prepayment of this Service Order calculated in accordance with Article 4.7(b) of this Service Framework Agreement shall be US$[756,000].

3.3. Account Information of Service Provider

Account Name: BlockQuarry Corp.
Bank Name: Chase Bank, N.A.
Bank Address: 270 Park Ave., New York, NY 10017
Account Number: 3962283686
Routing Number: 111000614
SWIFT CODE: CHASUS33XXX

**4.    TERM AND TERMINATION OF SERVICE ORDER**

4.1. This Service Order shall be effective from the date hereof and expire on the expiry or early termination of the Service Framework Agreement.

4.2. This Service Order may be terminated prior to its expiry:





(a)     upon mutual agreement in writing of the Parties;

(b)     upon either Party giving a written notice of no less than 60 calendar days to the other Party, *provided that* a compensation in an amount of one (1) month's Theoretical Hosting Fee shall be paid by this Party to such other Party upon termination;

(c)     upon BITMAIN giving a written notice to Service Provider if the Data Center Facility fails to meet its standard operational conditions for the Hosted Servers to power-on within 30 calendar days from the Initial Date; meanwhile, BITMAIN is not liable to pay Service Provider any fee, charges or expenses during the period of such operational conditions;

(d)     upon Service Provider giving a written notice to BITMAIN if BITMAIN fails to deliver the first batch of Hosted Servers within 30 calendar days from the estimated arrival time set forth in paragraph 2.2 of this Appendix II.

4.3.    Upon expiry or early termination of this Service Order, Service Provider shall

(a)     in any event no later than five (5) Business Days from the expiry or early termination, furnish to BITMAIN the Reconciliation Statement for the unpaid Billing Period(s) for reconciliation in accordance with Article 4.8 of the Service Framework Agreement; and

(b)     upon approval of the Reconciliation Statement, or the revised version as application, issue to BITMAIN the invoice of the Service Fees for the unpaid Billing Period(s).

4.4.    Settlement of Last Invoice

(a)     If there is any remaining portion of prepayment previously paid by BITMAIN to Service Provider after deducting the amount in the invoice, Service Provider shall remit such remaining portion of prepayment to BITMAIN within seven (7) Business Days from the date of the invoice; and

(b)     If the amount previously paid by BITMAIN to Service Provider as prepayment under this Service Order is insufficient to fully settle the invoice, BITMAIN shall make a payment to Service Provider to settle the outstanding amount in the invoice (after deducting the amount previously paid) within seven (7) Business Days from the date of the invoice.

(c)     If the settlement, whether in sub-paragraph (a) or (b) above, is not completed within seven (7) Business Days from the date of the invoice, the Party failing to settle the outstanding amount shall be liable for a late charge of 0.1% per day on the outstanding amount with effect from the eighth (8th) Business Day from the date of the invoice.



5.    **PREVAILING PROVISION**

In the event of any discrepancy between the provision of this Service Order and the Service Framework Agreement, the provision in this Service Order shall prevail.

*[The remainder of this page is intentionally left blank for signature]*

v4.0

**IN WITNESS WHEREOF**, the undersigned have executed this Service Order on the date first written above.

Signed for and on behalf of BITMAIN

**BITMAIN TECHNOLOGIES GEORGIA LIMITED**

Signature_____程然_____

Name:_____

Title:_____

Signed for and on behalf of the Service Provider

**BLOCKQUARRY CORP.**

Signature_____

Name: _____Alonzo Pierce_____

Title: _____11/11/2022_____

**APPENDIX III**
**SCOPE OF SERVICES**

**Part A: Hosting Service**

1.   Providing data center server rooms, server positions, racks, power load and facilities, broadband network and network facilities, security monitoring and other equipment reasonably required for the hosting and storage of the Hosted Servers of the reasonable commercial standard.

2.   Maintaining standard hosting environment for the Hosted Servers in accordance with the conditions set forth in the applicable Service Order.

3.   Ensuring safety and security of the Data Center Facility and the Hosted Server, taking standard industry practices to reduce the risk of accidents such as damage, theft, loss or fire.

4.   Maintaining stable electrical power supply, network connection and overall conditions of the Data Center Facility in compliance with the Service Order and sufficient for the Hosted Servers to achieve its normal operating status.

**Part B: Operation and Maintenance Service**

1.   Monitoring and reporting the status of the Hosted Servers.

2.   Racking and de-racking the Hosted Servers when necessary or in accordance with the instructions of BITMAIN Personnel.

3.   Configuring the Hosted Servers in accordance with the written authorization of BITMAIN, including accessing the designated mining pool, setting the server ID, updating the firmware version, etc.

4.   Notifying BITMAIN of any planned power outage.

Case 6:24-cv-03183-MDH   Document 1-3   Filed 06/25/24   Page 27 of 29



## APPENDIX III
## FORM OF RECONCILIATION STATEMENT

| Hosting Capacity 矿场容量 | Hosting Quantity 托管数量 | Billing Period 计费周期 | Power Consumption 耗电量 | Hosting Unit Price 托管单价 | Total Hosting Fee 总费用 |
|---|---|---|---|---|---|
| | | | | | |

Case 6:24-cv-03183-MDH   Document 1-3   Filed 06/25/24   Page 28 of 29



**IN WITNESS WHEREOF**, the undersigned have executed this Agreement on the date first written above.

Signed for and on behalf of BITMAIN

**BITMAIN TECHNOLOGIES GEORGIA LIMITED**

Signature_____程然_____

Name:_____

Title:_____

Signed for and on behalf of the Service Provider

**BLOCKQUARRY CORP.**

Signature_____

Name:_____Alonzo Pierce_____

Title: _____11/11/2022_____