# EXHIBIT 5

# Clifford, Nicholas B.

| | |
|---|---|
| **From:** | Speer, R. Taylor <TSpeer@foxrothschild.com> |
| **Sent:** | Wednesday, December 13, 2023 1:56 PM |
| **To:** | Clifford, Nicholas B. |
| **Cc:** | Feinstein, Marc; Farrell, Kaitie; Pao, William K.; Stutz, Kate |
| **Subject:** | Bitmain / Blockquarry |
| **Attachments:** | Release Agreement - Blockquarry and Bitmain(152861763.2)-C.pdf |

**<<< EXTERNAL EMAIL >>>**

Hi, counsel for Bitmain.  Please see the attached agreement.  It should be self-explanatory.  Best,



**R. Taylor Speer**
Counsel
Greenville, South Carolina

 (864) 751-7665

Learn about our new brand.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

# RELEASE AND COVENANT NOT TO SUE

| BLOCKQUARRY CORP. f/k/a ISW HOLDINGS, INC. | BITMAIN TECHNOLOGIES GEORGIA LIMITED and BITMAIN TECHNOLOGIES LTD. |
|---|---|

This 'release agreement and covenant not to sue' ("*Agreement*") is made and entered as of the 'effective date' identified below by and between Blockquarry Corp. f/k/a ISW Holdings, Inc. ("*Blockquarry*"), on the one hand, and Bitmain Technologies Georgia Limited ("*Bitmain Georgia*") and Bitmain Technologies Ltd. ("*Bitmain China*" and together with Bitmain Georgia, "*Bitmain*"), on the other, and sets forth the following terms agreed to by Blockquarry and Bitmain (collectively, "*Parties*").

## RECITALS

A. On or about June 21, 2021, ISW Holdings, Inc. entered a 'service framework agreement' with Bitmain China whereby Blockquarry agreed to provide Bitcoin mining hosting services in exchange for a fee ("*Georgia Agreement*"). The Georgia Agreement is null and void. Bitmain China paid no money pursuant to the Georgia Agreement, and Blockquarry provided no services pursuant to the Georgia Agreement.

B. During 2021, Blockquarry caused a name change to occur with the Nevada Secretary of State, changing the corporation's name from ISW Holdings, Inc. to Blockquarry Corp.

C. During 2022, Bitmain China stopped paying for hosting services provided by Blockquarry on a new Bitcoin mining location in Gaffney, South Carolina ("*Gaffney Site*"). Blockquarry was forced to pay hundreds of thousands of dollars in electric service fees to the incumbent electrical utility serving the Gaffney Site ("*Utility*") for hosting services provided to Bitmain China, with no reciprocal benefit from Bitmain China (or otherwise).

D. On or about September 1, 2022, Blockquarry entered a second 'service framework agreement' with Bitmain Georgia whereby Blockquarry agreed to provide Bitcoin mining hosting services in exchange for a fee ("*Subsequent Agreement*"). The Subsequent Agreement terminated the Georgia Agreement and provided for a mutual release of claims, if any, related thereto.

E. On or about January 9, 2023, the Utility cut power to the Gaffney Site and retained the personal property located thereon including all Bitcoin mining servers (collectively, "*Personal Property*").

F. On or about April 6, 2023, Bitmain, by way of its counsel, served a purported 'termination notice' via email, stating Bitmain "elected to terminate the Service Agreement with immediate effect."

G. On April 7, 2023, Blockquarry caused to be filed in United States District Court for the District of South Carolina a civil action against the Utility alleging, among other things, that the Utility unlawfully retained the Personal Property (case number: 7:23-cv-01427-TMC). Blockquarry further caused an emergency motion for temporary restraining order to be filed, requesting the court enter an order requiring that the Utility immediately return the Personal Property to Blockquarry. The April 7, 2023 court filings by Blockquarry and the subsequent litigation are hereinafter, collectively, the "*Civil Action*".

H. At all times material, Bitmain knew of the Civil Action and elected to have Blockquarry litigate the same, without intervening or otherwise investing in prosecution of the claims raised therein.

I. Blockquarry expended considerable money litigating the Civil Action, and the Utility continued to unlawfully retain the Personal Property until November 2023, when the Utility permitted Blockquarry to retrieve the Personal Property from the Gaffney Site.

J. Bitmain claims ownership of some portion of the Personal Property—*to wit*, certain unidentified Bitcoin mining servers—and has demanded return of the same.

These lettered paragraphs are hereinafter, collectively, "*Recitals*".

## TERMS

The Parties, for themselves, their predecessors, successors, and assigns, hereby agree as follows.

1.1 **Recitals**. The Recitals are part of this Agreement as if expressly stated herein.

1.2 **Consideration**. As of the Effective Date, the Parties acknowledge and stipulate to the receipt and sufficiency of valuable consideration for this Agreement, including, but not limited to the mutual benefits under this Agreement and Blockquarry's expenses and losses associated with litigating the Civil Action for it and Bitmain's benefit.

1.3 **Effective Date**. This Agreement is effective on the date that all Parties have executed this Agreement and delivered copies of such execution to the Parties' respective counsel ("*Effective Date*").

1.4 **Return of Servers**.

   1.4.1 Within (24) hours of the Effective Date, Blockquarry shall: 1) by email delivered to Bitmain's counsel, identify the precise location of the Personal Property belonging to Bitmain (by county, city, and street address) ("*Retrieval Site*") and 2) make available for inspection and retrieval to Bitmain the Personal Property belonging to Bitmain. The date upon which Blockquarry complies with this section is hereinafter, "*Retrieval Date*".

   1.4.2 Bitmain shall have no liability for the costs associated with the Personal Property belonging to Bitmain provided that Bitmain retrieves and removes all Personal Property belonging to Bitmain from the Retrieval Site within ten calendar days of the Retrieval Date. Bitmain shall thereafter pay or reimburse Blockquarry for all costs of storing, insuring, securing and, if necessary, relocating the Personal Property belonging to Bitmain (and/or any portion thereof), and shall make such payments or reimbursements to Blockquarry immediately upon demand.

   1.4.3 The Personal Property belonging to Bitmain shall be deemed abandoned by Bitmain provided that Bitmain does not retrieve the Personal Property belonging to Bitmain from the Retrieval Site within thirty calendar days of the Retrieval Date. Blockquarry shall be entitled to dispose of sell and otherwise take title to the Personal Property provided that Bitmain abandons the same under this Section 1.4.3.

   1.4.4 As a material term of this Agreement, Bitmain represents and warrants it has not on its behalf and/or by and through others made any statement, report or inquiry to law enforcement relative to Blockquarry, its principals, and/or the Personal Property.

   1.4.5 To the extent Bitmain cannot truthfully and lawfully make the representation and warranty provided in Section 1.4.4, Bitmain shall

retract such statement, report or inquiry in full and provide Blockquarry satisfactory evidence that such retraction has occurred. Blockquarry's performance(s) required by Section 1.4 shall be excused and not be required until Bitmain provides to Blockquarry such satisfactory evidence. All other terms of this Agreement shall, however, remain in effect.

1.5 **Mutual Release**. The Parties hereto, each on their own behalf and on behalf of all parent companies, subsidiaries, affiliates, partnerships, divisions, owners, officials, members, directors, officers, shareholders, commissioners, employees, agents, servants, partners, attorneys, counsel, firms, representatives, insurers, independent contractors, investors, clients, bailors, heirs, executors, administrators, successors, assigns, and other parties in interest thereto, hereby release and discharge the other Party and that Party's respective parent companies, subsidiaries, divisions, owners, officials, members, directors, officers, shareholders, commissioners, employees, attorneys, counsel, firms, heirs, executors, administrators, successors, and assigns from any and all debts, duties, liabilities, obligations, claims, demands, actions, and causes of action, including without limitation, those for costs, rights, attorneys' fees, damages, interest, loss of service, lost profits, expenses, and compensation of whatsoever nature, now existing; and all damages known and foreseen, liquidated or unliquidated, at law or in equity of any nature, including without limitation, property damages, loss of use damages, personal injury damages, lost profit damages and the consequences thereof resulting, which heretofore have been, and which hereafter may be, sustained by the undersigned, as a result of the claims pertaining to any occurrence, accident, casualty, or event that in any way relates to, pertains to, or arises out of the Georgia Agreement, the Subsequent Agreement, the Civil Action, and/or the Personal Property.

1.6 **Covenant Not to Sue**.

   1.6.1 Bitmain covenants never to initiate, be represented or participate in, submit or file, or permit to be submitted or filed on his, her or its behalf, any lawsuit, charge, claim, complaint or other proceeding pertaining to any occurrence, accident, casualty, or event that in any way relates to, pertains to, or arises out of the Georgia Agreement, the Subsequent Agreement, the Civil Action, and/or the Personal Property.

   1.6.2 The covenant provided in this Section 1.6 shall not apply to any civil action to enforce this Agreement to the extent such action complies with this Agreement.

1.7 **General**.

    1.7.1 *Merger / Modifications / Waiver.*

        1.7.1.1 As of the Effective Date, the Parties agree this Agreement is the sole agreement by and between Blockquarry and Bitmain. This Agreement contains the entire agreement between the Parties relating to the transaction contemplated hereby, and all prior or contemporaneous agreements, understandings, representations, and statements, oral or written, including those associated with the Georgia Agreement and Subsequent Agreement, are merged herein.

        1.7.1.2 No modification, amendment, discharge, or change of the Agreement, except as otherwise provided herein, shall be valid unless the same is in writing and signed by the party against whom the enforcement of such modification, waiver, amendment, discharge, or change is sought. The captions, headings, and arrangements used in this Agreement are for convenience only and do not in any way affect, limit, amplify, or modify the terms and provisions of this Agreement.

    1.7.2 *Choice of Law / Enforcement / Attorneys Fees*. This Agreement shall be construed and enforced in accordance with the laws of South Carolina. The Parties expressly consent to the exclusive jurisdiction of the courts located in South Carolina regarding any dispute arising out of or related to this Agreement. Any action to enforce this Agreement shall be brought in the courts located in the state of South Carolina. The prevailing party in any action to enforce this Agreements shall be entitled to tax against the other party the prevailing party's reasonable attorneys fees and costs, including expert witness fees, if any.

    1.7.3 *Successors*. This Agreement is binding upon, and shall inure to the benefit of, the Parties and their heirs, predecessors, successors, assigns, affiliates, agents, insurers, employees, legal representatives, and any other persons or entities acting on their behalf or claiming through or under them or any of them, and shall inure to the benefit of the Parties, as well as each of their respective heirs, predecessors, successors, assigns, affiliates, agents, insurers, employees, legal representatives, and any other persons or entities acting on their behalf or claiming through or under them or any of them.

1.7.4 *No Assignment*. The Parties covenant and agree that each has not assigned, transferred, or conveyed in any manner all or any part of their legal claims or legal rights in connection with the matters set forth in this Agreement.

1.7.5 *Consultation with Counsel*. Each Party, before executing this Agreement, had an opportunity to consult with counsel with respect to the full force and effect of this Agreement and each of the terms and provisions hereof, and each Party fully understands and intends the full force and effect of this Agreement and each of its terms and provisions. Each Party has had a full and complete opportunity to investigate any and all matters believed by them to be appropriate or prudent for investigation or understanding prior to entering into this Agreement.

1.7.6 *Authorship*. The Parties agree that this Agreement has been drafted jointly by the Parties hereto and no one party shall be deemed to be the party who drafted the Agreement.

1.7.7 *Third-Party Beneficiaries*. This Agreement shall bind, and be for the benefit of, the Parties and their respective successors and permitted assigns. Nothing in this Agreement, expressed or implied, is intended to confer upon any person other than the Parties any rights, remedies, obligations, or liabilities under, or by reason of, this Agreement.

1.7.8 *Confidentiality and Non-disparagement*.

    1.7.8.1 The Parties agree that, except as required by law, as allowed herein, or as required to enforce the undertakings set forth in this Agreement, each of the Parties shall keep strictly confidential and not disclose to any person or entity, other than its board members, legal counsel, tax, insurance and/or financial advisors, and employees whose job responsibilities require knowledge of such matters, each of whom will be informed of the obligation to abide by this confidentiality provision, the terms of this Agreement and details of the associated negotiations.

    1.7.8.2 The Parties agrees not to make any negative, disparaging, detrimental, or derogatory remarks or statements (written, oral, telephonic, electronic, or by any other method) about the other Party or make any statement to the media or on social media regarding this Agreement or the facts arising out of this Agreement.

1.7.8.3 An aggrieved party hereunder, may resort to a court of equity to enforce this provision of the Agreement by temporary and/or permanent injunctive relief and/or restraining order or such other legal and equitable remedies as may be appropriate, in addition to any other remedy at law and shall not be required to post a bond in any such action or proceeding.

1.7.8.4 This covenant survives the execution of this Agreement indefinitely.

1.7.9 *Counterparts*.  This Agreement may be executed in two or more identical counterparts, all of which shall constitute one and the same Agreement, provided that in making proof of this Agreement, it shall not be necessary to produce or account for more than one such fully executed counterpart. Any signature attestation required by this Agreement may be transmitted via telecopier or email, and signature and attestations so transmitted shall be as binding as the original.

1.7.10 *Headings*.  The headings of this Agreement are for the convenience of the Parties only and shall not limit, expand, modify, or aid in the interpretation or constructions of this Agreement.

1.7.11 *Authority and Final Declarations*.  The undersigned representatives of the Parties declare and represent that they have the authority to bind the Party for whom they have signed; they have read this Agreement and acknowledge that no promise, inducement, or agreement not herein expressed has been made to them; this instrument contains the entire agreement between the Parties hereto and that the terms of this incident are contractual and not a mere recital; and if any paragraph or part of this Agreement is found void or unenforceable, the remainder of this Agreement shall not be affected.

The Parties' signatures below are consent for this Agreement.

| BLOCKQUARRY CORP. f/k/a ISW HOLDINGS, INC. | BITMAIN TECHNOLOGIES GEORGIA LIMITED |
|---|---|
| By: _____ | By: _____ |
| Name:_____ | Name:_____ |
| Its: _____ | Its: _____ |
| Date: _____ | Date: _____ |

and BITMAIN TECHNOLOGIES LTD.

By: _____

Name:_____
Its: _____
Date: _____

# EXHIBIT 9

for an onsite meeting, and it will be coordinated through me with Blockquarry. I understand Blockquarry personnel will be available, in-person, to assist with the inspection and/or pickup.

Note Blockquarry is only relinquishing *Bitmain's* personal property—*i.e.*, its servers. It is not relinquishing Blockquarry's other personal property (*e.g.*, servers, transformers, or mining pods) or permitting access to other personal property unless access is reasonably necessary for Bitmain's inspection or other material and related purposes. Finally, to the extent Bitmain is contemplating a transaction with Blockquarry (or others), Blockquarry will continue to entertain offers for the same.

Best,



**R. Taylor Speer**
Counsel
Greenville, South Carolina
(864) 751-7665

**Learn about our new brand**.

---

**From:** Clifford, Nicholas B. <Nicholas.Clifford@tuckerellis.com>
**Sent:** December 15, 2023 4:51 PM
**To:** Speer, R. Taylor <TSpeer@foxrothschild.com>
**Cc:** Feinstein, Marc <mfeinstein@omm.com>; Farrell, Kaitie <kfarrell@omm.com>; Pao, William K. <wpao@omm.com>; Stutz, Kate <kstutz@omm.com>
**Subject:** [EXT] RE: Bitmain / Blockquarry

Mr. Speer,

Please see the attached letter.

Regard,
Nick

**Nicholas Clifford**
Direct: 314-571-4962
Cell: 314-809-7416
Nicholas.clifford@tuckerellis.com

---

**From:** Speer, R. Taylor <TSpeer@foxrothschild.com>
**Sent:** Wednesday, December 13, 2023 1:56 PM
**To:** Clifford, Nicholas B. <Nicholas.Clifford@tuckerellis.com>
**Cc:** Feinstein, Marc <mfeinstein@omm.com>; Farrell, Kaitie <kfarrell@omm.com>; Pao, William K. <wpao@omm.com>;

# EXHIBIT 10



100 S Fourth Street, Suite 600 | St. Louis, MO 63102 | TEL 314.256.2550 | FAX 314.256.2549

December 15, 2023

DIRECT DIAL 314.571.4962 | nicholas.clifford@tuckerellis.com

**VIA EMAIL – tspeer@foxrothschild.com**

R. Taylor Speer
Fox Rothschild
2 W. Washington Street
Suite 1100
Greenville, SC 29601

Re: **_Blockquarry Corp.'s Proposed Release and Covenant Not to Sue_**

Dear Mr. Speer:

  We write in response to Blockquarry Corp.'s ("Blockquarry") Proposed Release and Covenant Not to Sue (the "Proposed Release") that you sent to us on Wednesday, December 13, 2023 via email at 1:58 pm CT.

  Bitmain Technologies Georgia Limited ("Bitmain Georgia") and Bitmain Technologies Ltd. ("Bitmain Ltd." and together with Bitmain Georgia and its affiliates, "Bitmain") reject Blockquarry's Proposed Release and dispute the Recitals therein as containing false and misleading statements. Blockquarry is engaging in extortionate conduct by holding Bitmain's machines hostage and demanding a settlement and covenant not to sue from Bitmain in exchange for the release of its machines. Such conduct must stop immediately.

  Since February 2023, Bitmain has been prevented from retrieving over 4,500 of its Bitcoin mining machines (the "Machines"), formerly located at the Gaffney, South Carolina data center facility (the "Facility"). Blockquarry does not dispute that the Machines rightfully belong to Bitmain, yet Blockquarry has been holding the Machines hostage for more than a month. *See, e.g.*, *Blockquarry Corp. v. Litchain Corp. et al.*, Case No. 7:23-cv-01427, United States District Court for the District of South Carolina, Dkt. No. 1, ¶ 30 ("Blockquarry's clients own personal property kept on the [Facility] . . . . Blockquarry is the bailee of its client's personal property kept on the [Facility]."); Dkt. No. 26-1, Ex. 1 (inventory listing the serial numbers of the Machines).

  On or around November 2, 2023, Blockquarry and the Gaffney Board of Public Works entered into a settlement agreement to facilitate the release of the Machines and other property located at the Facility. Despite Blockquarry's obligation to facilitate the release of the Machines to Bitmain, Blockquarry **(i)** prevented Bitmain from retrieving the Machines directly from the Facility; **(ii)** transported the Machines from the Facility to an undisclosed location in Missouri without Bitmain's authorization and despite Bitmain's repeated objections; **(iii)** refused to provide photos or videos depicting the condition of the Machines; **(iv)** refused to organize a business meeting to arrange for the return and/or sale of the Machines; **(v)** withheld the address where the Machines were located in Missouri; and **(vi)** has been unresponsive to repeated communications from Bitmain's counsel

tuckerellis.com



requesting cooperation and clarification as to the location, condition, and return of the Machines.[1]

In addition to exposing itself to potential criminal liability, Blockquarry is subject to substantial civil damages for the thousands of dollars of losses which continue to accrue each day that the Machines are not in operation. Additionally, to the extent that an attorney was involved in Blockquarry's extortionate conduct, this raises serious ethical concerns. *See* S.C. R. Prof'l Cond. 1.2(d) ("A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyers knows is criminal or fraudulent[.]"); 8.4 ("It is professional misconduct for a lawyer to…commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer…[or] engage in conduct involving dishonesty, fraud, deceit, or misrepresentation[.]").

We demand that you immediately disclose to us the precise location (by state, county, city, and street address) of the Machines and provide access to them so that Bitmain may pick them up. Bitmain reserves all of its rights and remedies. Nothing in this communication shall constitute a waiver of any of Bitmain's rights or remedies.

Sincerely,

TUCKER ELLIS LLP

Nicholas Clifford, Jr.

---

[1] *See* O'Melveny & Myers LLP's ("O'Melveny") November 6, 2023 email ("Bitmain does not want its machines to be transported to Jackson County, Missouri and demands that it be able to off rack and pack the machines from the [Facility]."); O'Melveny November 7, 2023 email ("Blockquarry had no right to transport the machines from the [Facility] to Missouri without Bitmain's authorization…Please let us know immediately when the machines will arrive at the Missouri facility and please provide Blockquarry's availability for a business-to-business meeting."); O'Melveny November 7, 2023 email ("Bitmain requests that Blockquarry immediately send videos and photos showing the packaging and condition of the machines. Bitmain also requests that Blockquarry immediately send the specific address of the Jackson County, Missouri facility."); Speer November 9, 2023 email ("I would communicate with you verbally if there was a need; there is no need at this time…you should expect a communication from me at the end of next week or the beginning of the following week (e.g., Monday, November 20). Until that time, please cease the demands, telephone calls, and emails."); O'Melveny November 9, 2023 email (repeating requests for a business-to-business meeting, the estimated arrival time of the Machines, the address of the Missouri facility, and videos and photos of the condition of the Machines); Speer November 17, 2023 email (the Machines "continue[] in transport…I expect to have something substantive to you by end of next week and potentially early the following week (i.e., week beginning Dec. 4.)"); O'Melveny November 17, 2023 email ("Bitmain reiterates that it does not consent to Blockquarry moving the machines or testing the machines…Bitmain repeats its request that Blockquarry send pictures and videos of the machines to ensure that the machines are being transported safely and repeats its request that you provide the address for the facility…Bitmain repeats its request that you provide Blockquarry's availability for a business meeting…Bitmain's offer to sell shall be deemed cancelled[.]"); Tucker Ellis LLP December 5, 2023 email (requesting the "[c]urrent location of the [Machines] including the name, address, and email address/telephone number of any facility…[and the] status of the machines[.]").



Cc:   William Pao
      Marc Feinstein
      Kate Stutz
      Kaitie Farrell