# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

BITMAIN TECHNOLOGIES GEORGIA    )
LIMITED,    )
        )
    Plaintiff,    )
        )      Case No: 6:24-cv-03183-MDH
vs.    )
        )
HYLMEN LLC, and    )
        )
SHAWN VAUGHT,    )
        )
    Defendants.    )

## DECLARATION OF NICHOLAS CLIFFORD

I, Nicholas Clifford, hereby declare as follows:

1.    I am a partner of the law firm Tucker Ellis LLP, and counsel for Bitmain Technologies Georgia Limited ("Bitmain"), the Plaintiff in the above-referenced matter. I submit this declaration in support of Bitmain's Emergency Motion for the Appointment of a Receiver. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could, and would, testify competently thereto.

2.    Attached are true and correct copies of the following:

- Email string between December 19, 2023 and December 26, 2023 between counsel for Blockquarry Corp., formerly known as ISW Holdings, Inc. ("Blockquarry") (Taylor Speer) and counsel for Bitmain (including Nicholas Clifford), attached as **Exhibit 1**.

- Letter, dated December 29, 2023, from counsel for Bitmain (Nicholas Clifford) to counsel for Blockquarry (Taylor Speer), attached as **Exhibit 2**.

- Email with attached letter, dated February 20, 2024, from counsel for Bitmain (Marc Feinstein with CC to Nicholas Clifford) to counsel for Blockquarry (Taylor Speer), attached as **Exhibit 3**.

3.    Blockquarry first notified Bitmain on December 19, 2023 that it did not transport

Bitmain's S19J Pro mining machines ("Miners") from South Carolina to Jackson County, Missouri, as originally indicated by Blockquarry's counsel by telephone on November 6, 2023. Instead, Blockquarry relocated the Bitmain Miners to a site in Crocker, Missouri owned by Defendants ("Crocker Site"). *See* Ex. 1 (December 19, 2023 email from T. Speer).

4.      Blockquarry moved Bitmain's Miners to Crocker, Missouri without Bitmain's knowledge or permission, and it described the Crocker Site as "unimproved land" and "a staging ground" that did not have electric power.  Ex. 1 (December 21, 2023 email from T. Speer). Blockquarry identified the address of the site as 29590 Highway U, Crocker, Missouri, 65452. *Id.* (December 19, 2023 email from T. Speer).

5.      I researched the ownership of the Crocker Site, using the Pulaski County, Missouri Assessor's Office website (http://www.pulaskicountymo.org/assessor.html) and determined that it is owned by Hylmen LLC, one of the defendants in the above-referenced lawsuit.  *See* Property Report Card, attached as **Exhibit 4**.

6.      Blockquarry agreed to permit Bitmain to inspect the Miners located at the Crocker Site on December 28, 2023.  *See* Ex. 1 (December 22, 2023 emails from T. Speer).

7.      Following the inspection, I sent a letter to Blockquarry's counsel reporting on the lack of access to all of the Miners, the inadequacies of the conditions at the site, the apparent damage to some of the Miners, and the absence of any electricity (which prevented a complete inspection). *See* Ex. 2.

8.      After the December 2023 inspection, Bitmain and Blockquarry engaged in negotiations over the potential sale of Bitmain Miners to Blockquarry in early 2024.  The negotiations failed.  Following the conclusion of the negotiations, Bitmain once again demanded the return of the Bitmain Miners.  *See* Ex. 3.

9. On April 9, 2024, I traveled to the Crocker Site. When I arrived, I spoke to the supervisor on site and requested to inspect the containers and Bitmain's Miners. The supervisor said he needed to speak to the "owner," and he used his cellphone to call Shawn Vaught. He gave the phone to me and I spoke with Mr. Vaught. I explained that I am counsel for Bitmain and requested to see the Bitmain Miners. Mr. Vaught refused to grant permission, so I left. While I was still on site, I learned from the supervisor that the containers and the Miners are not powered.

10. Following my attempted inspection on April 9, 2024, I had several email and telephone communications with Mr. Vaught's lawyer, David Bandré from Bandre' Hunt & Snider, LLC, in Jefferson City, Missouri. I reiterated multiple times Bitmain's demand to inspect the Bitmain Miners located on Mr. Vaught's property and to secure their return to Bitmain. Mr. Bandré notified me that Mr. Vaught would not agree to permit an inspection by Bitmain and would not agree to turn the Bitmain Miners over to Bitmain.

11. Mr. Bandré confirmed to me that neither Mr. Vaught nor Hylmen LLC owned the Miners. But his clients claimed (without providing justification) that Bitmain did not have proof of ownership of the Bitmain Miners, even though I provided him the agreement between Blockquarry and Bitmain expressly stating that the Miners were "owned by BITMAIN."

12. In addition, Mr. Bandré told me that Mr. Vaught had agreed to release some of the miners that had been transported from South Carolina to certain unidentified third parties who provided documentation of ownership to him. I was not provided with any information about which miners were released, what documentation was provided, or whether any Bitmain Miners were released to such third parties.

13. I have attempted to contact Mr. Vaught's counsel multiple times since our last communication in May 2024, but he has not returned any of my communications.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July

2, 2024 in St. Louis, Missouri.

_____
Nicholas Clifford

6511823.2

# EXHIBIT 1

**Clifford, Nicholas B.**

| | |
|---|---|
| **From:** | Speer, R. Taylor <TSpeer@foxrothschild.com> |
| **Sent:** | Tuesday, December 26, 2023 2:38 PM |
| **To:** | Clifford, Nicholas B. |
| **Cc:** | Feinstein, Marc; Farrell, Kaitie; Pao, William K.; Stutz, Kate |
| **Subject:** | Re: Bitmain / Blockquarry |

&lt;&lt;&lt; EXTERNAL EMAIL &gt;&gt;&gt;

Stephen Stenberg - tel:917-426-1516
Lawrence Davis - tel:954-661-2109

R. Taylor Speer
Counsel
Fox Rothschild LLP

**From:** Clifford, Nicholas B. <Nicholas.Clifford@tuckerellis.com>
**Sent:** Tuesday, December 26, 2023 3:06:18 PM
**To:** Speer, R. Taylor <TSpeer@foxrothschild.com>
**Cc:** Feinstein, Marc <mfeinstein@omm.com>; Farrell, Kaitie <kfarrell@omm.com>; Pao, William K. <wpao@omm.com>;
Stutz, Kate <kstutz@omm.com>
**Subject:** [EXT] RE: Bitmain / Blockquarry

No, Bitmain will not have counsel present.

**Nicholas Clifford**
Direct: 314-571-4962
Cell: 314-809-7416
Nicholas.clifford@tuckerellis.com

**From:** Speer, R. Taylor <TSpeer@foxrothschild.com>
**Sent:** Tuesday, December 26, 2023 1:29 PM
**To:** Clifford, Nicholas B. <Nicholas.Clifford@tuckerellis.com>
**Cc:** Feinstein, Marc <mfeinstein@omm.com>; Farrell, Kaitie <kfarrell@omm.com>; Pao, William K. <wpao@omm.com>;
Stutz, Kate <kstutz@omm.com>
**Subject:** Re: Bitmain / Blockquarry

&lt;&lt;&lt; EXTERNAL EMAIL &gt;&gt;&gt;

Confirmed, yes. Will Bitmain have counsel present through Sofia, Shawn, or otherwise?  Best,

R. Taylor Speer
Counsel
Fox Rothschild LLP

**From:** Clifford, Nicholas B. <Nicholas.Clifford@tuckerellis.com>
**Sent:** Tuesday, December 26, 2023 10:40 AM
**To:** Speer, R. Taylor <TSpeer@foxrothschild.com>
**Cc:** Feinstein, Marc <mfeinstein@omm.com>; Farrell, Kaitie <kfarrell@omm.com>; Pao, William K. <wpao@omm.com>; Stutz, Kate <kstutz@omm.com>
**Subject:** [EXT] RE: Bitmain / Blockquarry

Taylor,

Yuexian Chen (Sophia) and Haishan Sun (Shawn) for Bitmain will be present on Dec. 28 at 10 am at 29590 Highway U, Crocker, MO 65452.

According to Google Maps, this is an image of the location:



It located on Hwy U approximately 8 miles west of the center of Crocker, Missouri.  See image below:



Please confirm this is <u>exactly</u> where the Bitmain representatives should meet the Blockquarry representatives on Thursday.

Thank you,
Nick

**Nicholas Clifford**
Direct: 314-571-4962
Cell: 314-809-7416
Nicholas.clifford@tuckerellis.com

---

**From:** Speer, R. Taylor <TSpeer@foxrothschild.com>
**Sent:** Friday, December 22, 2023 6:48 PM
**To:** Clifford, Nicholas B. <Nicholas.Clifford@tuckerellis.com>
**Cc:** Feinstein, Marc <mfeinstein@omm.com>; Farrell, Kaitie <kfarrell@omm.com>; Pao, William K. <wpao@omm.com>; Stutz, Kate <kstutz@omm.com>
**Subject:** RE: Bitmain / Blockquarry

<<< EXTERNAL EMAIL >>>

---

Should have added, that's December 28.  Best,



**R. Taylor Speer**
Counsel
Greenville, South Carolina
📞 (864) 751-7665

Learn about our new brand.

---

**From:** Speer, R. Taylor
**Sent:** December 22, 2023 7:47 PM
**To:** 'Clifford, Nicholas B.' <Nicholas.Clifford@tuckerellis.com>
**Cc:** Feinstein, Marc <mfeinstein@omm.com>; Farrell, Kaitie <kfarrell@omm.com>; Pao, William K. <wpao@omm.com>; Stutz, Kate <kstutz@omm.com>
**Subject:** RE: Bitmain / Blockquarry

Blockquarry representatives Lawrence Davis and Stephen Stenberg will be present at **10:00 a.m. at address 29590 Highway U, Crocker, MI, 65452** to meet with Bitmain. Blockquarry does not intend to have counsel present. If Bitmain will have counsel present, please advise, as this will likely change Blockquarry's position on that score. Similarly, please provide the names of persons Bitmain will have present. Best,



**R. Taylor Speer**
Counsel
Greenville, South Carolina
📞 (864) 751-7665

Learn about our new brand.

---

**From:** Clifford, Nicholas B. <Nicholas.Clifford@tuckerellis.com>
**Sent:** December 22, 2023 1:20 PM
**To:** Speer, R. Taylor <TSpeer@foxrothschild.com>
**Cc:** Feinstein, Marc <mfeinstein@omm.com>; Farrell, Kaitie <kfarrell@omm.com>; Pao, William K. <wpao@omm.com>; Stutz, Kate <kstutz@omm.com>
**Subject:** [EXT] RE: Bitmain / Blockquarry

Mr. Speer,

Bitmain is available on December 28.

Please confirm the precise time and location where the parties will meet.

Please confirm the names of any Blockquarry representatives (including counsel) who will attend the meeting.

Regards,
Nick

**Nicholas Clifford**
Direct: 314-571-4962
Cell: 314-809-7416
Nicholas.clifford@tuckerellis.com

---

**From:** Speer, R. Taylor <TSpeer@foxrothschild.com>
**Sent:** Thursday, December 21, 2023 9:05 PM
**To:** Clifford, Nicholas B. <Nicholas.Clifford@tuckerellis.com>
**Cc:** Feinstein, Marc <mfeinstein@omm.com>; Farrell, Kaitie <kfarrell@omm.com>; Pao, William K. <wpao@omm.com>; Stutz, Kate <kstutz@omm.com>
**Subject:** RE: Bitmain / Blockquarry

**<<< EXTERNAL EMAIL >>>**

---

Counsel for Bitmain,

Blockquarry accepts Bitmain's request to perform an initial inspection of Bitmain's servers at the Crocker, Missouri site (Premises), prior to Bitmain taking possession of its property. Blockquarry is not available, however, on December 26. One of Blockquarry's officers, Lawrence Davis, will be in Missouri and can make himself available on the Premises on December 28 or the following day. There is much to discuss during this visit, including a potential transaction between Blockquarry and Bitmain, so Blockquarry prefers Bitmain's delegate speak English. This will facilitate a productive dialogue.

All of the personal property present on the Gaffney, South Carolina site when Blockquarry was finally given access was moved by Blockquarry to the Premises—nowhere else. I understand the Premises is unimproved land and acted as a staging ground. Blockquarry has not tested or used Bitmain's servers, and the Premises do not have electric power.

Please respond with Bitmain's availability on December 28 or 29, and I'll confirm. Best,



**R. Taylor Speer**
Counsel
Greenville, South Carolina

📞 (864) 751-7665

Learn about our new brand.

---

**From:** Clifford, Nicholas B. <Nicholas.Clifford@tuckerellis.com>
**Sent:** December 21, 2023 11:39 AM
**To:** Speer, R. Taylor <TSpeer@foxrothschild.com>
**Cc:** Feinstein, Marc <mfeinstein@omm.com>; Farrell, Kaitie <kfarrell@omm.com>; Pao, William K. <wpao@omm.com>; Stutz, Kate <kstutz@omm.com>
**Subject:** [EXT] RE: Bitmain / Blockquarry

Mr. Speer,

Contrary to the incomplete and misleading representations in your email below, Blockquarry acted without Bitmain's authority, refused to provide the location of the machines when requested, and further refused to give Bitmain access to its own machines -- all in blatant disregard of its legal duties, exposing it to civil and criminal liability. Putting your revisionist history aside, we are pleased to see that Blockquarry has finally realized that it needs to return Bitmain's machines without further delay. Bitmain will make arrangements for its personnel to inspect the machines at the Crocker, Missouri address you provided. Then, once it has all of the information it needs in order to pick them up, it will make arrangements for a pick up on a separate date. Bitmain proposes the inspection take place on **Tuesday, December 26, 2023**. We will provide you with proposed dates for the pickup after the inspection is complete.

Please confirm this inspection date is acceptable for Blockquarry.

Also, in the meantime, please provide us with the following information.

1.      Are 100% of Bitmain's machines listed on the serial number list we previously provided you located at that Crocker, MO address? Are any of Bitmain's machines located at other locations besides the Crocker, MO address?

2.      Did Blockquarry test or otherwise use any of Bitmain's machines after BPW released them? Will Blockquarry confirm that all of the machines are in working order? If not, please provide a list of the machines Blockquarry claims need repair.

3.      Is the Crocker site powered and are the machines currently operating?

Regards,
Nick

**Nicholas Clifford**
Direct: 314-571-4962
Cell: 314-809-7416
Nicholas.clifford@tuckerellis.com

**From:** Speer, R. Taylor <TSpeer@foxrothschild.com>
**Sent:** Tuesday, December 19, 2023 8:46 PM
**To:** Clifford, Nicholas B. <Nicholas.Clifford@tuckerellis.com>
**Cc:** Feinstein, Marc <mfeinstein@omm.com>; Farrell, Kaitie <kfarrell@omm.com>; Pao, William K. <wpao@omm.com>; Stutz, Kate <kstutz@omm.com>
**Subject:** RE: Bitmain / Blockquarry

**<<< EXTERNAL EMAIL >>>**

Counsel for Bitmain,

I write to respond to Bitmain's December 15, 2023 letter.  Blockquarry and I disagree with the characterizations contained in Bitmain's letter; however, we reach out to provide input and additional context and to offer a resolution.  I recapitulate the unusual history of this matter below and offer additional information I expect you are unaware of.

On October 18, I advised, on behalf of Blockquarry, that BPW Gaffney agreed to permit Blockquarry access to the Gaffney premises to inspect the personal property located on the site, including Bitmain's servers (that Blockquarry alleged in a federal complaint were being unlawfully retained by Gaffney BPW).  I spoke on the telephone with Bitmain's counsel, Kaitie Farrell, on November 3 and November 6.  In the intervening time, your client and, later, a third-party communicated with Blockquarry, directly, making overtures to sell the machines to Blockquarry.  During the November 6 call, I informed you, on behalf of Blockquarry, that Blockquarry was in possession of the personal property and was transporting it to Blockquarry's site located in Jackson County, Missouri, in part, to test the servers and determine whether Blockquarry wanted to purchase the machines.  As described, this was necessary because the Gaffney site did not have power, and Blockquarry had no access to the machines otherwise since February 2023.  On November 9, I confirmed this in writing.  On November 17, I followed with an email explaining that transportation of the machines continued and that testing would occur during the week of November 20.  On the same day, Kaitie responded, continuing to discuss the possibility of Blockquarry purchasing the machines.

As late as November 30, a third party was communicating directly with Blockquarry, purportedly on behalf of or at the behest of Bitmain, related to coordination and inspection of machines.  On December 1, the same third party communicated with Blockquarry, directly, discussing that Bitmain offered to sell *it* the machines and requesting to discuss the same.  As late as December 6, the same third party continued to discuss a potential sale of the machines and for use of those machines *on Blockquarry's Jackson County site via a new hosting agreement with Blockquarry*.  To say the least, it has been a challenge to determine who has authority to speak on behalf of your client and what are the terms of purchase or return of the machines.

In any event, the machines are currently located at address 29590 highway U, Crocker, MI, 65452.  Please respond to this email with proposed dates when Bitmain or its vendors will be available

for an onsite meeting, and it will be coordinated through me with Blockquarry. I understand Blockquarry personnel will be available, in-person, to assist with the inspection and/or pickup.

Note Blockquarry is only relinquishing *Bitmain's* personal property—*i.e.*, its servers. It is not relinquishing Blockquarry's other personal property (*e.g.*, servers, transformers, or mining pods) or permitting access to other personal property unless access is reasonably necessary for Bitmain's inspection or other material and related purposes. Finally, to the extent Bitmain is contemplating a transaction with Blockquarry (or others), Blockquarry will continue to entertain offers for the same.

Best,



**R. Taylor Speer**
Counsel
Greenville, South Carolina
📞 (864) 751-7665

**Learn about our new brand.**

---

**From:** Clifford, Nicholas B. <Nicholas.Clifford@tuckerellis.com>
**Sent:** December 15, 2023 4:51 PM
**To:** Speer, R. Taylor <TSpeer@foxrothschild.com>
**Cc:** Feinstein, Marc <mfeinstein@omm.com>; Farrell, Kaitie <kfarrell@omm.com>; Pao, William K. <wpao@omm.com>; Stutz, Kate <kstutz@omm.com>
**Subject:** [EXT] RE: Bitmain / Blockquarry

Mr. Speer,

Please see the attached letter.

Regard,
Nick

**Nicholas Clifford**
Direct: 314-571-4962
Cell: 314-809-7416
Nicholas.clifford@tuckerellis.com

---

**From:** Speer, R. Taylor <TSpeer@foxrothschild.com>
**Sent:** Wednesday, December 13, 2023 1:56 PM
**To:** Clifford, Nicholas B. <Nicholas.Clifford@tuckerellis.com>

**Cc:** Feinstein, Marc <mfeinstein@omm.com>; Farrell, Kaitie <kfarrell@omm.com>; Pao, William K. <wpao@omm.com>; Stutz, Kate <kstutz@omm.com>
**Subject:** Bitmain / Blockquarry

<<< EXTERNAL EMAIL >>>

---

Hi, counsel for Bitmain.  Please see the attached agreement.  It should be self-explanatory.  Best,



**R. Taylor Speer**
Counsel

Greenville, South Carolina
📞 (864) 751-7665

**Learn about our new brand.**

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient,

or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

# EXHIBIT 2



100 S Fourth Street, Suite 600 | St. Louis, MO 63102 | TEL 314.256.2550 | FAX 314.256.2549

December 29, 2023

DIRECT DIAL 314.571.4962 | nicholas.clifford@tuckerellis.com

**VIA EMAIL – tspeer@foxrothschild.com**

R. Taylor Speer
Fox Rothschild
2 W. Washington Street
Suite 1100
Greenville, SC 29601

Re: ***Bitmain Technologies Georgia Limited's Offer to Sell Machines to Blockquarry Corp.***

Dear Mr. Speer:

Pursuant to Bitmain Technologies Georgia Limited ("Bitmain Georgia") and Blockquarry Corp.'s ("Blockquarry") agreement, on December 28, 2023, Bitmain Georgia personnel visited Blockquarry's site located at 29590 Highway U, Crocker, Missouri, 65452 (the "Site") to inspect the 4,513 Bitcoin mining machines (the "Machines") that were the subject of Bitmain Georgia and Blockquarry's Service Framework Agreement, dated September 1, 2022.

Bitmain Georgia could only inspect 12 of the 16 containers holding its Machines because 4 of the containers were locked and unable to be opened by Blockquarry personnel. From the containers that Bitmain Georgia was able to inspect, its inspection revealed missing and damaged machines:

- Bitmain Georgia calculated a total of 3,021 Machines, leaving 1,492 Machines missing or locked in the 4 containers;

- Bitmain Georgia identified water leakage in the containers, which may have caused water damage to Machines that were off-racked and placed on the floor of the containers;

- Bitmain Georgia identified Machines that had rusted fans and, upon disassembling three Machines for a more thorough inspection, Bitmain Georgia identified internal rust, including rust on the hashrate board.

Bitmain Georgia is willing to sell the Machines to Blockquarry for the price of $7/T with a one month warranty.

If Blockquarry refuses this offer, Bitmain Georgia demands that the Machines be returned immediately on the following terms:

- Blockquarry will, under the supervision of Bitmain Georgia personnel and according to instructions provided by Bitmain Georgia, promptly off-rack, dust, scan the serial number code of the Machines with a barcode scanner (with records to be provided immediately to Bitmain

tuckerellis.com


Georgia), package the Machines, and load the Machines onto Bitmain Georgia's designated logistics provider's vehicles. The parties shall agree on dates in the next 10 days to complete this process. Bitmain Georgia will pay Blockquarry $20 per unit.

- Bitmain Georgia will send containers to the Site for storage during the removal process.

- Bitmain Georgia will not pay for any of the transportation costs from South Carolina to Missouri. As discussed in our December 15, 2023 letter, Bitmain Georgia did not consent to its Machines being transported from South Carolina to Missouri and requested that Blockquarry allow Bitmain Georgia to retrieve the Machines from the South Carolina facility.

Please let us know whether Blockquarry accepts Bitmain Georgia's offer to sell the Machines or Bitmain Georgia's terms for returning the Machines.

Bitmain Georgia reserves all of its rights and remedies, including the right to bring a claim for the missing and damaged machines or other losses, including the thousands of dollars of losses continuing to accrue each day Bitmain Georgia's Machines are not in operation. Nothing herein shall constitute a waiver of any of Bitmain's rights or remedies.

Sincerely,

TUCKER ELLIS LLP

Nicholas Clifford, Jr.

Cc:   William Pao
      Marc Feinstein
      Kate Stutz
      Kaitie Farrell

# EXHIBIT 3

**Clifford, Nicholas B.**

| | |
|---|---|
| **From:** | Farrell, Kaitie <kfarrell@omm.com> |
| **Sent:** | Tuesday, February 20, 2024 7:20 PM |
| **To:** | Taylor Speer (TSpeer@foxrothschild.com) |
| **Cc:** | Feinstein, Marc; Iden, David; Parikh, Sherin; Clifford, Nicholas B. |
| **Subject:** | Bitmain Georgia - Demand for Return of Miners |
| **Attachments:** | 2024.2.20 Letter re Machines.pdf |

**<<< EXTERNAL EMAIL >>>**

Taylor,

Please see the attached correspondence.

Thank you,
Kaitie

## O'Melveny

**Kaitlyn G. Farrell**
kfarrell@omm.com
O: +1-213-430-7869

O'Melveny & Myers LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Website | LinkedIn | Twitter

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*



O'Melveny & Myers LLP
400 South Hope Street
18th Floor
Los Angeles, CA 90071-2899

T: +1 213 430 6000
F: +1 213 430 6407
omm.com

File Number:

**Marc Feinstein**
D: +1 213 430 7274
mfeinstein@omm.com

February 20, 2024

<u>**VIA EMAIL**</u>

R. Taylor Speer
Fox Rothschild
2 W. Washington Street
Suite 1100
Greenville, South Carolina 29601
tspeer@foxrothschild.com

*Re:*    *<u>Bitmain Technologies Georgia Limited's Demand for Return of Miners</u>*

Mr. Speer:

On February 14, 2024, Blockquarry Corp. ("Blockquarry") sent Bitmain Technologies Georgia Limited ("Bitmain Georgia") a notice of withdrawal from the parties' negotiations regarding Blockquarry's anticipated purchase of miners from Bitmain Georgia.  In light of Blockquarry's withdrawal, Bitmain Georgia hereby renews its demand that all of Bitmain's miners be returned immediately to Bitmain Georgia.

Bitmain Georgia proposes the following to facilitate the immediate return of the miners:

- Blockquarry will, pursuant to Bitmain Georgia's instructions, promptly off-rack, dust, scan the serial number code of the miners with a barcode scanner (with records to be provided immediately to Bitmain Georgia), package the miners, and load the miners onto Bitmain Georgia's designated logistics provider's vehicles (the "Return Process"). Bitmain Georgia will pay Blockquarry $20 per unit for these services.

- Bitmain Georgia may have representatives present to monitor and supervise the Return Process.

- The parties shall agree on dates within the next 10 days to conduct the Return Process.

To demonstrate proof of Bitmain Georgia's ownership of the miners, enclosed herein as **Attachment A**, is a Sales and Purchase Agreement by and between Burdy US Corporation and Bitmain Georgia.

Please inform us immediately whether Blockquarry agrees to the above arrangements and provide Blockquarry's available dates to conduct the Return Process.

Austin · Century City · Dallas · Houston · Los Angeles · Newport Beach · New York · San Francisco · Silicon Valley · Washington, DC
Beijing · Brussels · Hong Kong · London · Seoul · Shanghai · Singapore · Tokyo
4881-6041-9468

Case 6:24-cv-03183-MDH   Document 4-4   Filed 07/03/24   Page 22 of 40



Bitmain Georgia reserves all of its rights and remedies, including the right to assert claims and pursue damages and other relief that relate to, arise out of, or are connected to the miners or the Service Framework Agreement, including, but not limited to, claims for lost or damaged miners or for lost profits. Nothing herein shall constitute a waiver of any of Bitmain Georgia's rights or remedies.

Sincerely,

Marc Feinstein



**ATTACHMENT A**

# SALES AND PURCHASE AGREEMENT

## BETWEEN

**Burdy US Corporation**
("Seller")

## AND

**BITMAIN TECHNOLOGIES GEORGIA LIMITED**
("Purchaser")



Case 6:24-cv-03183-MDH   Document 4-4   Filed 07/03/24   Page 25 of 40

This agreement (this "Agreement") is made on January 22th, 2024 by and between Burdy US Corporation (the "Seller"), with its registered office at 1013 Centre Road, Suite 403S, Wilmington, DE 19805, County of New Castle, USA, and BITMAIN TECHNOLOGIES GEORGIA LIMITED (the "Purchaser"), with its registered office at 840 New Burton Street, Suite 201, Dover, Kent, DE 19904.

The Seller and the Purchaser shall hereinafter collectively be referred to as the "Parties," and individually as a "Party."

Whereas:

1. Purchaser fully understands the market risks and the market fluctuations relating to the Products sold under this Agreement.

2. Seller acquired the Products and owns them.

3. Blockquarry Corp., formerly ISW Holdings, Inc., originally obtained possession of the Products pursuant to a Service Framework Agreement between Blockquarry and Purchaser ("Hosting Agreement"), with Purchaser acting as Seller's agent in relation to the Products, and continues to possess the Products and has failed to cooperate in returning them.

4. Purchaser is willing to purchase and Seller is willing to sell the Products.

5. Based on the information presently available to them regarding the location of the Products, the Parties understand that the Products, or a portion of them, were originally delivered to Blockquarry Corp. ("Blockquarry"), formerly ISW Holdings, Inc., at the site located at 154 Hyatt St., Gaffney, SC 29341, and were subsequently moved by Blockquarry without Purchaser or Seller's authorization to a site in Crocker, Missouri.

6. Seller desires that Purchaser quickly make arrangements with Blockquarry for Purchaser to obtain access to the Products and remove them to such facility as Purchaser shall designate.

The Parties hereto agree as follows:

**1. Definitions and Interpretations**

The following terms, as used herein, have the following meanings:

"Assigned Claims" means present or future claims and causes of action Seller has or may have against Blockquarry, or its directors, officers, principals, partners, members, shareholders, affiliates, employees, agents, or representatives, related to or arising out of the Products or the Hosting Agreement, including, but not limited to, Blockquarry's refusal to return the Products or unauthorized use or transportation of the Products, damage to the Products, missing or lost Products, or loss of use of the Products.

"Applicable Law" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, without limitation, local law, law of any other state or part thereof or international law, and which creates or purports to create any requirement or rule that may affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

"Force Majeure" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party, which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement, including to the extent such event or occurrence shall delay, prevent or hinder such Party from performing such obligation, war (declared or undeclared), terrorist activities, acts of sabotage, blockade, fire, lightning, acts of god, national strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, landslides, avalanches, floods, hurricanes, explosions and regulatory and administrative or similar action or delays to take actions of any governmental authority.

"Order" means Purchaser's request to Seller for certain Products in accordance with this Agreement.

"Products" means the 4,513 Bitcoin mining machines delivered by Purchaser to the site located at 154 Hyatt St., Gaffney, SC 29341in or around the period February to April 2022, including but not limited to the Bitcoin mining machines listed in Appendix B.

"Total Purchase Price" means the aggregate amount payable by Purchaser.

Interpretations:
i)      Words importing the singular include the plural and vice versa where the context so requires.
ii)     The headings in this Agreement are for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement.
iii)    References to Clauses and Appendix(es) are references to Clauses and Appendix(es) of this Agreement.
iv)     Unless specifically stated otherwise, all references to days shall mean calendar days.
v)      Any reference to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re-enactment or amendment thereof for the time being in force.

## 2.  Sales of Products

Seller agrees to sell and provide to Purchaser the Products, free and clear of any and all pledges, liens, charges, encumbrances and security interests of any kind or nature (collectively, the "Liens") in accordance with provisions of Clause 2, Clause 3, Clause 4 and Clause 5 of this Agreement, and Purchaser shall make payment in accordance with the terms specified in this Agreement.   Seller shall (i) transfer, assign, convey and deliver to Purchaser ownership of the Products free and clear of any and all Liens, and (ii) deliver a

3 / 11

duly executed bill of sale in the form attached hereto as Appendix B, in each case upon full execution of this Agreement.

2.1.  Both Parties agree as follows:
    (i)     Purchaser shall place the Order substantially in the form of Appendix A through methods accepted by Seller.
    (ii)    After receiving the Order, Seller will send an order receipt confirmation email to Purchaser.
    (iii)   Purchaser shall pay the down payment in accordance with Clause 3.1 and Appendix A of this Agreement.
    (iv)   Upon receipt of the down payment, Seller will send a shipping confirmation to Purchaser after it has delivered the Products to the carrier, and the Order shall be deemed accepted by the Seller upon the Seller's issuance of the shipping confirmation.

## 3.  Prices and Terms of Payment

3.1  The Purchaser shall pay the Total Purchase Price in accordance with Appendix A of this Agreement.

3.2  The Parties understand and agree that the Total Purchase Price is exclusive of the insurance fee, tax, applicable bank transaction fee and the logistics costs of shipping from place of delivery designated by Seller to the designated place of Purchaser, relevant maintenance or other applicable costs of Purchaser to purchase the Products, and any and all applicable import duties, taxes and governmental charges. The Products purchased by Purchaser from Seller may be resold to the customer of the Purchaser, under which circumstance and pursuant to the relevant tax regulation of the United States, Seller shall not charge any additional turnover tax in relation to the Products or the payment of any amount made by Purchaser under this Agreement, including but not limited to sales and use tax, value-added tax and any other governmental charges and duties similar to the turnover taxes.   Except for the fees explicitly agreed to in this Agreement, which shall be borne by Seller, any other fees not included in the Total Purchase Price shall be borne by Purchaser.

## 4.  Customs

4.1  Seller hereby confirms that it has obtained in due time and maintained throughout the term of this Agreement (if applicable) any and all approvals, permits, authorizations, licenses and clearances for the import of the Products into the United States that are required to be obtained by Seller or the carrier under Applicable Laws. Seller shall, upon request of Purchaser, provide full package of the custom clearance documents in respect of the import of the Products into the United States.

## 5  Representations and Warranties

Each of the Parties makes the following representations and warranties to the other Party:

5.1  It has the full power and authority to own its assets and carry on its businesses.

5.2    The obligations expressed to be assumed by it under this Agreement are legal, valid, binding and enforceable obligations.

5.3    It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement.

5.4    The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with:
(i)     any Applicable Law;
(ii)    its constitutional documents; or
(iii)   any agreement or instrument binding upon it or any of its assets.

## 6    Indemnification and Limitation of Liability

6.1    Notwithstanding anything to the contrary herein, each Party shall under no circumstances, be liable to the other Party for any consequential loss, or loss of goodwill, business, anticipated profits, revenue, contract, or business opportunity arising out of or in connection with this Agreement, and each Party hereby waives any claim it may at any time have against the other Party in respect of any such damages. The foregoing limitation of liability shall apply whether in an action at law, including but not limited to contract, strict liability, negligence, willful misconduct or other tortious action, or an action in equity.

6.2    Each Party's cumulative aggregate liability pursuant to this Agreement, whether arising from tort, breach of contract or any other cause of action, shall be limited to and not exceed the amount of one hundred percent (100%) of the down payment actually received by Seller from the Purchaser for the Products.

## 7    Mutual Release and Assignment of Claims

7.1    In accordance with the terms hereof, and except as expressly agreed herein, each Party hereby releases, acquits, remits and forever discharges the other Party, and each of its current and former directors, officers, attorneys, agents, and other representatives, from and against any claims, liens, demands, actions, causes of action, suits, debts, accounts, covenants, indemnities, damages, costs, attorneys' fees, fines, penalties, judgments, obligations and liabilities of any kind, nature or description, whether in law or in equity, whether compulsory or permissive, whether sounding in tort, contract, statutory, regulatory violation or otherwise, arising out of or relating to the Hosting Agreement or the Products, whether known or unknown, discovered or undiscovered, vested or contingent, liquidated or unliquidated, direct, derivative or subrogated in any fashion existing as of the Effective Date. Nothing in this paragraph is intended to affect or reduce the Assigned Claims.

7.2    Seller represents and warrants as of the date it executes this Agreement that (a) it has not assigned, transferred or pledged the Assigned Claims, and the Assigned Claims

5 / 11

are free and clear of any third party claim, security interest, pledge or other right; and (b) no contractual prohibition or restriction exists to preclude or prevent the full transfer and assignment of the Assigned Claims.

7.3   Seller hereby unconditionally transfers and assigns to Purchaser all of the Assigned Claims.

## 8   Distribution

This Agreement does not constitute a distributor agreement between Seller and Purchaser. Therefore, Purchaser is not an authorized distributor of Seller.

## 9   Confidentiality and Communications

All information concerning this Agreement and matters pertaining to or derived from the provision of Products pursuant to this Agreement between the Parties, whether in oral or written form, or in the form of drawings, computer programs or other, as well as all data derived therefrom ("Confidential Information"), shall be deemed to be confidential and, as such, may not be divulged to any unauthorized person. Each Party undertakes and agrees to take all reasonable and practicable steps to ensure and protect the confidentiality of the Confidential Information which shall not be passed, sold, traded, published or disclosed to any unauthorized person. The Parties agree that Purchaser may disclose this Agreement to Blockquarry.

## 10   Term and Termination of this Agreement

10.1   This Agreement will be effective as of the date hereof and shall remain effective through the delivery of the last batch of Products.

10.2   The Parties agree that, unless this Agreement specifies otherwise, no Party shall terminate this Agreement in advance.

10.3   Termination of this Agreement shall be without prejudice to the rights and liabilities of the Parties accrued prior to or as a result of such termination, including those related to antecedent breaches. Termination of this Agreement for any cause or otherwise shall not release a Party from any liability which at the time of termination has already accrued to the other Party or which thereafter may accrue in respect of any act or omission prior to such termination. The rights and obligations of the Parties under Clause 1 (Definitions and Interpretations), Clause 9 (Confidentiality and Communications), Clause 10 (Term and Termination of this Agreement) and Clause 14 (Governing Law and Dispute Resolution) shall survive the termination of this Agreement.

## 11   Entire Agreement and Amendment

This Agreement, constitutes the entire agreement of the Parties hereto and can only be amended with the written consent of both Parties or otherwise as mutually agreed by both Parties.

## 12 Assignment

12.1 Neither Party shall assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part without the other Party's prior written consent.

12.2 This Agreement shall be binding upon and inure to the benefit of each Party to this Agreement and its successors in title and permitted assigns.

## 13 Severability

To the extent possible, if any provision of this Agreement is held to be illegal, invalid or unenforceable in whole or in part by a court, the provision shall apply with whatever deletion or modification is necessary so that such provision is legal, valid and enforceable and gives effect to the commercial intention of the Parties. The remaining provisions of this Agreement shall not be affected and shall remain in full force and effect.

## 14 Governing Law and Dispute Resolution

14.1 This Agreement shall be solely governed by and construed in accordance with the laws of the State of Georgia, the United States.

14.2 All disputes arising under this agreement shall be governed by and interpreted in accordance with the laws of the State of Georgia, without regard to principles of conflict of laws. The parties to this agreement will submit all disputes arising under this agreement to arbitration in Houston, Texas before a single arbitrator of the American Arbitration Association ("AAA"). The arbitrator shall be selected by application of the rules of the AAA, or by mutual agreement of the parties, except that such arbitrator shall be an attorney admitted to practice law in the State of Georgia. No party to this agreement will challenge the jurisdiction or venue provisions as provided in this section. No party to this agreement will challenge the jurisdiction or venue provisions as provided in this section. Nothing contained herein shall prevent the party from obtaining an injunction. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.

## 15 Waiver

Failure by either Party to enforce at any time any provision of this Agreement, or to exercise any election of options provided herein shall not constitute a waiver of such provision or option, nor affect the validity of this Agreement or any part hereof, or the right of the waiving Party to thereafter enforce each and every such provision or option.

## 16  Counterparts and Electronic Signatures

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, will be deemed to constitute one and the same agreement. The facsimile, email or other electronically delivered signatures of the Parties shall be deemed to constitute original signatures, and facsimile or electronic copies hereof shall be deemed to constitute duplicate originals.

## 17  Further Assurance

Each Party undertakes to the other Party to execute or procure to be executed all such documents and to do or procure to be done all such other acts and things as may be reasonable and necessary to give all Parties the full benefit of this Agreement.   At any time or from time to time hereafter, Seller shall, at the reasonable request of Purchaser, take all action as may be necessary to put Purchaser in actual possession and operating control of the Products and the Assigned Claims, and shall execute, acknowledge and deliver such further instruments of conveyance, power of attorney, sale, transfer or assignment, and take such other actions as Purchaser may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

*(The rest part of the page is intentionally left in blank)*

Case 6:24-cv-03183-MDH   Document 4-4   Filed 07/03/24   Page 32 of 40

Signed for and on behalf of the Purchaser

**Bitmain Technologies Georgia Limited**

Signature ___程然___

Title _____

Signed for and on behalf of the Seller

**Burdy US Corporation**

For and on behalf of
**Burdy  US  Corporation**

Signature ___Cai huijun___

Title _____

*Authorised  Signature(s)*

9 / 11

## APPENDIX A

### Order

Seller shall arrange delivery within thirty (30) days after the Agreement is signed and will provide the following products:

| Description of Products | Price | | | |
|---|---|---|---|---|
| | Unit Price | Units | Total Rated Hashrate (T) | Total(USD) |
| S19 Pro 104T | 9.1 USD/T | 3,073 | 319,592 | **2,908,287.20** |
| S19j Pro100T | 9.1 USD/T | 1,440 | 144,000 | **1,310,400.00** |
| **In Total** | - | **4,513** | **463,592** | **4,218,687.20** |
| **TOTAL ESTIMATED PURCHASE PRICE: 4,218,687.20 USD** | | | | |
| **The final Total Purchase Price will be calculated based on the actual hashrate at the time of delivery.** | | | | |
| Down payment: twenty percent (20%) of the Total Purchase Price will be paid within fifteen (15) days after the execution of this Agreement. | | | | |
| Balance payment: eighty percent（80%）of the Total Purchase Price will be paid within thirty (30) days after delivery of the Products. | | | | |

Seller's BANK ACCOUNT info:
Company Name: BURDY US CORPORATION
Company address:    1013 CENTRE RD STE 403S, WILMINGTON, DE 19805
Account No.:    857661653
Bank name: Chase Bank
Bank address:    270 Park Ave, New York NY 10017
ABA Routing：021000021
SWIFT Code：CHASUS33

Wallet address for cryptocurrency USDT：
TRC20: TSMoo4iVb3VWzs6Pi8jdSi56g94C8feHjc
ERC20: 0xaE4282B137Ef866aA73ADabF74d791e655d3E6ba

**APPENDIX B**

**Bill of Sale**

(*Attached*)

11 / 11

<center>**BILL OF SALE**</center>

<center>**January 22, 2024**</center>

This Bill of Sale (this "Bill of Sale") is entered into by and between Burdy US Corporation ("Seller"), on the one hand, and Bitmain Technologies Georgia Limited ("Purchaser"), on the other hand.

<center>**WITNESSETH:**</center>

WHEREAS, Seller and Purchaser are parties to that certain Sales and Purchase Agreement, dated as of even date herewith (the "Purchase Agreement"), pursuant to which, among other things, Seller agreed to sell, assign, transfer, convey and deliver to Purchaser, and Purchaser agreed to purchase from Seller, all of Seller's right, title and interest in and to the Products and the Assigned Claims.

WHEREAS, "Products" means the 4,513 Bitcoin mining machines delivered by Purchaser to the site located at 154 Hyatt St., Gaffney, SC 29341 in or around the period February to April 2022, including but not limited to the Bitcoin mining machines listed in the attachment hereto.

NOW, THEREFORE, pursuant to the terms and conditions of the Purchase Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.     Defined Terms.  Capitalized terms used but not defined herein shall have the respective meanings assigned to such terms in the Purchase Agreement.

2.     Sale of Assets.  Effective as of the date of full execution of the Purchase Agreement, Seller hereby sells, assigns, transfers, conveys and delivers to Purchaser, free and clear of all Liens, all of Seller's right, title and interest in, to and under the Products and the Assigned Claims.

3.     Further Assurances.  At any time or from time to time hereafter, Seller shall, at the reasonable request of Purchaser, take all action as may be necessary to put Purchaser in actual possession and operating control of the Products and the Assigned Claims, and shall execute, acknowledge and deliver such further instruments of conveyance, power of attorney, sale, transfer or assignment, and take such other actions as Purchaser may reasonably request in order to more effectively consummate the transactions contemplated by this Bill of Sale.

4.     Effect of Agreement.  This Bill of Sale is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.  Nothing contained in this Bill of Sale shall be construed to supersede, limit or qualify any provision of the Purchase Agreement.  To the extent there is a conflict between the terms and provisions of this Bill of Sale and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern.

5.     Counterparts.  This Bill of Sale may be executed in multiple counterparts, and by the different parties hereto in separate counterparts, each of which shall for all purposes be deemed to be an original, and all of which taken together shall constitute one and the same instrument.  A signature delivered on any counterpart by facsimile or other electronic means shall for all purposes be deemed to be an original signature to this Bill of Sale.



6.  <u>Amendment</u>.  This Bill of Sale may not be amended or modified except by an instrument in writing signed by Seller and Purchaser.

7.  <u>Governing Law</u>.  This Bill of Sale shall in all respects be construed in accordance with and governed by the substantive laws of the State of Georgia, without reference to its choice of law rules.  Each party hereto agrees and acknowledges that the application of the laws of the State of Georgia is reasonable and appropriate based upon the parties' respective interests and contacts with the State of Georgia.  Each of the parties waives any right or interest in having the laws of any other state, including specifically, state law regarding the statute of limitation or other limitations period, apply to any party's state law claim, controversy or dispute which in any way arises out of or relates to this Bill of Sale or the transactions contemplated hereby.

8.  <u>Successors and Assigns</u>.  This Bill of Sale and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon Purchaser and Seller, and their respective successors and permitted assigns.

9.  <u>Assignment</u>.  Neither this Bill of Sale nor any of the rights, interests or obligations hereunder may be assigned by any party hereto, in whole or in part (whether by operation of law or otherwise), without the prior written consent of the other party hereto; provided, however, that without such prior written consent:  (a) Purchaser may assign its rights and/or delegate its obligations under this Bill of Sale (in whole but not in part) to any affiliate of Purchaser; (b) any or all of the rights and interests and/or obligations of Purchaser under this Bill of Sale: (i) may be assigned and/or delegated to any purchaser of a substantial portion of the assets of Purchaser or any of its affiliates (whereupon Purchaser shall cease to have any further liabilities or obligations hereunder); and (ii) may be assigned as a matter of law to the surviving entity in any merger, consolidation, share exchange or reorganization involving Purchaser or any of its affiliates; and (c) Purchaser and its affiliates shall be permitted to collaterally assign, at any time and in their sole discretion, their respective rights hereunder to any lender or lenders providing financing to Purchaser or any of its affiliates (including any agent for any such lender or lenders) or to any assignee or assignees of such lender, lenders or agent.

*[Signature Page Follows]*



2

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale to be duly executed as of the date first set forth above.

**SELLER:**

**Burdy US Corporation**

For and on behalf of
**Burdy US Corporation**

By: _Cai huijun_
...................................................
*Authorised Signature(s)*

Title:


**PURCHASER:**

**Bitmain Technologies Georgia Limited**

By: 程然

Title:



*[Signature Page to Bill of Sale]*

# EXHIBIT 4

# Pulaski County, MO

## Property Report Card

### Parcel Number: 049029000000003002

Account Number: 0601704002

Owner Name: HYLMEN LLC

Property Address: 29590 HWY U

Owner Address: 29590 HIGHWAY U

Owner City: CROCKER

Owner State/Zip: MO 65452-7406

Acres: 39.70

Section: 29

Township: 38

Range: 13

School: CROCKER

Deed Book Page: 202200769

Date Acquire: 2/7/2022 12:00:00 AM

Legal Description: PT W2 SW4 LYING W/HWY U

Data contained within this web site was created from record research provided by the county and/or city. Pulaski County, Missouri does not guarantee any accuracies to the data or attribute information displayed, queried, or printed from this web site. This web site is only intended for informational purposes.